Filed 4/4/16

# IN THE SUPREME COURT OF CALIFORNIA

NYKEYA KILBY,

      Plaintiff and Appellant,

      v.

CVS PHARMACY, INC.,

      Defendant and Respondent.
_____

AND CONSOLIDATED CASE.
_____

S215614

9th Cir. Nos.
12-56130/13-56095

S.D. Cal. No.
3:09-CV-2051-MMA-KSC

C.D. Cal. No.
2:11-CV-3428-PSG-PLA

        The Ninth Circuit has certified questions[1] involving California wage order requirements that an employer provide suitable seating for employees under certain circumstances.  The wage orders at issue here state that "[a]ll working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats."  (Cal. Code Regs., tit. 8, §§ 11040, subd. 14(A) (Wage Order No. 4-2001), 11070, subd. 14(A) (Wage Order No. 7-2001).) We frame the Ninth Circuit's questions as follows.[2]

_____

[1]     See California Rules of Court, rule 8.548.
[2]     See California Rules of Court, rule 8.548(f)(5).

(1) Does the phrase "nature of the work" refer to individual tasks performed throughout the workday, or to the entire range of an employee's duties performed during a given day or shift?

(2) When determining whether the nature of the work "reasonably permits" use of a seat, what factors should courts consider? Specifically, are an employer's business judgment, the physical layout of the workplace, and the characteristics of a specific employee relevant factors?

(3) If an employer has not provided any seat, must a plaintiff prove a suitable seat is available in order to show the employer has violated the seating provision?

As explained in greater detail below, we answer those questions as follows.

(1) The "nature of the work" refers to an employee's tasks performed at a given location for which a right to a suitable seat is claimed, rather than a "holistic" consideration of the entire range of an employee's duties anywhere on the jobsite during a complete shift. If the tasks being performed at a given location reasonably permit sitting, and provision of a seat would not interfere with performance of any other tasks that may require standing, a seat is called for.

(2) Whether the nature of the work reasonably permits sitting is a question to be determined objectively based on the totality of the circumstances. An employer's business judgment and the physical layout of the workplace are relevant but not dispositive factors. The inquiry focuses on the nature of the work, not an individual employee's characteristics.

(3) The nature of the work aside, if an employer argues there is no suitable seat available, the burden is on the employer to prove unavailability.

## I. BACKGROUND

The certified questions arise in two related federal appeals. The cases involve application of identical seating provisions contained in wage orders

2

promulgated by the Industrial Welfare Commission (the IWC) in the context of two different industries.**3**

### A. *Kilby v. CVS Pharmacy, Inc.*

Nykeya Kilby worked for eight months as a customer service representative for CVS Pharmacy, Inc. (CVS). During both the interview and training process, CVS told Kilby it expected her to stand while performing her various duties. Although actual duties varied by both store and shift, Kilby's duties included operating a cash register, straightening and stocking shelves, organizing products in front of and behind the sales counter, cleaning the register, vacuuming, gathering shopping baskets, and removing trash. CVS did not provide Kilby a seat for these tasks.

Kilby filed a federal class action lawsuit alleging CVS violated Wage Order No. 7-2001, applicable to the mercantile industry. Section 14, subdivision (A) (section 14(A)) of that order provides: "All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats." (Wage Order No. 7-2001, § 14(A).) On the other hand, section 14, subdivision (B) (section 14(B)) of the wage order states: "When employees are *not* engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties." (Wage Order No. 7-2001, § 14(B), italics added.) The district court concluded that sections 14(A) and 14(B) were mutually exclusive. It reasoned that section 14(A)

---

**3**    Although the Legislature defunded the IWC in 2004, its wage orders remain in effect. (*Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 838, fn. 6 (*Mendiola*).)

3

applied when an employee was actually engaged in work, while section 14(B) applied when an employee was not actively working. Thus, it concluded that in evaluating the " 'nature of the work' " under section 14(A), an employee's "entire range of assigned duties" must be considered to determine whether the work permits the use of a seat or requires standing. (*Kilby v. CVS Pharmacy, Inc.* (S.D.Cal. 2012) 2012 U.S.Dist. LEXIS 76507, *14.) It noted "there is no dispute that many of the duties performed by Clerk/Cashiers at CVS require the employee to stand while performing them . . . ." (*Ibid*.) Accordingly, it granted summary judgment. Kilby appealed.

### B. *Henderson v. JPMorgan Chase Bank NA*

Kemah Henderson and three other bank tellers (collectively, Henderson) worked at JPMorgan Chase Bank (Chase) branches. They filed a class action suit against Chase for violating the suitable seating provision of Wage Order No. 4-2001, section 14, subdivision (A) (section 14(A)), applicable to "professional, technical, clerical, mechanical, and similar occupations." (Wage Order No. 4-2001, subd. 1.) This provision mirrors Wage Order No. 7-2001, section 14(A) at issue in *Kilby*. (See Wage Order No. 4-2001, § 14(A).) Chase bank tellers had duties associated with their teller stations, including accepting deposits, cashing checks, and handling withdrawals. They also had duties away from their stations, such as escorting customers to safety deposit boxes, working at the drive-up teller window, and making sure that automatic teller machines were working properly. These duties varied depending on the shift or branch location and whether the employee was a lead or regular teller. Based on these differences, the district court denied class certification. (*Henderson v. JPMorgan Chase Bank* (C.D.Cal. 2013) 2013 U.S.Dist. LEXIS 185099; see *Kilby v. CVS Pharmacy, Inc.* (9th Cir. 2003) 739 F.3d 1192, 1194-1195.) Henderson appealed.

4

## II. DISCUSSION

### A. Legal Background

Over a century ago, the Legislature responded to the problem of inadequate wages and poor working conditions by establishing the IWC, giving it authority to investigate various industries and promulgate wage orders establishing minimum wages, maximum work hours, and conditions of labor. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*); see Cal. Const., art. XIV, § 1; Lab. Code, § 1173 [duties of the IWC].) "[I]n fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 (*Industrial Welfare Com.*); see *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 800.)

"We have explained that 'wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority:  the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC.' [Citation.]  The IWC, a state agency, was empowered to issue wage orders, which are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions.  [Citations.] Of the 18 wage orders in effect today, '16 cover[] specific industries and occupations, one cover[s] all employees not covered by an industry or occupation order, and a general minimum wage order amend[s] all others to conform to the amount of the minimum wage currently set by statute.' " (*Mendiola, supra,* 60 Cal.4th at pp. 838-839, fn. omitted.)  IWC regulations are liberally construed to protect and benefit employees.  (*Id.* at p. 840; *Brinker*, *supra*, 53 Cal.4th at pp. 1026-1027; *Industrial Welfare Com.*, *supra*, 27 Cal.3d at p. 702.)  "The IWC's

5

wage orders are to be accorded the same dignity as statutes." (*Brinker*, at p. 1027.) "When a wage order's validity and application are conceded and the question is only one of interpretation, the usual rules of statutory interpretation apply." (*Ibid*.; *Von Nothdurft v. Steck* (2014) 227 Cal.App.4th 524, 531-532.)

### B. History of the Seating Provision

In 1911, the Legislature enacted a provision requiring employers in the mercantile industry to "provide suitable seats for all female employees" and to allow them "to use such seats when they are not engaged in the active duties of their employment." (Stats. 1911, ch. 258, § 2, p. 437.) The five-member IWC board was established in 1913. (Stats. 1913, ch. 324, § 1, pp. 632-633; *Industrial Welfare Com.*, *supra*, 27 Cal.3d at p. 700.) Its initial mission was to regulate the wages, hours, and conditions of employment for women and children to promote their health and welfare. (*Industrial Welfare Com.*, at p. 700.) In 1916, the commission promulgated its first industry- and occupation-wide wage orders, setting minimum requirements for "women and child laborers." (*Ibid*.)

In 1919, the IWC adopted the following order for the mercantile industry: "(a) Seats of the proper height shall be provided in all rooms to the number of at least one seat for every two women employed . . . . Women shall be permitted to use the seats at all times when not engaged in the active duties of their occupation. . . . [¶] In any room where manufacturing, altering, repairing, finishing, cleaning or laundering is carried on, the following provision shall also apply: [¶] (b) As far as, and to whatever extent, in the judgment of the [IWC], the nature of the work permits, the following provisions shall be effective: [¶] Seats shall be provided at work tables or machines for each and every woman or minor employed, and such seats shall be . . . so adjusted to the work table or machines that the position of the worker relative to the work shall be substantially the same,

6

whether seated or standing.  Work tables . . . shall be of such dimensions and design that there are no physical impediments to efficient work in either a sitting or standing position . . . ."  (IWC order No. 13, Mercantile Establishments (eff. Feb. 17, 1920) § 23, italics omitted.)  In 1931, the IWC replaced this order with a substantially similar one applying to all industries.  (IWC order No. 18, Sanitary Regulations for Any Occupation, Trade, or Industry (eff. Feb. 26, 1932) § 12.)[4]

In 1947, the IWC adopted an order applicable to the mercantile industry that eliminated the specific reference to work tables and machines.  The new provision read:  "Suitable seats shall be provided for all female employees.  When the nature of the work requires standing, an adequate number of said seats shall be placed adjacent to the work area and employees shall be permitted to use such seats when not engaged in the active duties of their employment."  (IWC order No. 7 R, Wages, Hours, and Working Conditions for Women and Minors in the

---

[4]      Section 12 of that order, Seats and Work Tables, stated in relevant part: "(*a*) Seats of the proper height shall be provided in all places where women or minors are employed to the number of at least one (1) seat for every two (2) women employed, and evenly distributed in that proportion.  Women and minors shall be permitted to use the seats at all times when not engaged in the active duties of their occupation.  As far as and to whatever extent, in the judgment of the Commission, when women are required by the nature of their work to stand, a relief period shall be given every two (2) hours of not less than ten (10) minutes. . . .  [¶] (*b*) As far as, and to whatever extent, in the judgment of the Commission, the nature of the work permits, the following provisions shall be effective:  Seats shall be provided at work tables or machines for each and every woman or minor employed, and such seats shall be capable of such adjustment and shall be kept so adjusted to the work table or machines that the position of the worker relative to the work shall be substantially the same, whether seated or standing.  Work tables, including cutting and canning tables and sorting belts, shall be of such dimensions and design that there are no physical impediments to efficient work in either a sitting or standing position . . . ."  (IWC order No. 18, Sanitary Regulations for Any Occupation, Trade, or Industry, *supra*, § 12.)

7

Mercantile Industry (June 1, 1947) § 17.)  This seating provision remained unchanged as the IWC adopted new wage orders in 1952, 1957, and 1963.[5]

A 1968 wage order added subdivisions to the seating provision and clarified that female employees were entitled to suitable seats when "the nature of the work permits."  (IWC wage order No. 7-68, Wages, Hours, and Working Conditions for Women and Minors in the Mercantile Industry (Feb. 1, 1968) § 18, former Cal. Admin. Code, tit. 8, § 11215-18, subd. (a).)[6]  This review demonstrates that the "nature of the work" involved has been an aspect of these regulations since at least 1919.  In 1972 and 1973, the Labor Code was amended to allow the IWC to make its wage orders applicable to all employees regardless of age or gender.  (*Industrial Welfare Com.*, *supra*, 27 Cal.3d at p. 701.)

In 1976, the IWC modified the relevant wage orders to expressly incorporate a reasonableness standard.  Seating was to be made available "when the nature of the work *reasonably* permits the use of seats."  (IWC wage order No. 7-76, Wages, Hours, and Working Conditions in the Mercantile Industry (Oct. 18, 1976) § 14, subd. (A), former Cal. Admin. Code, tit. 8, § 11215-14, subd. (a), italics added.)  When the nature of the work required standing, employees not

---

[5]     See IWC wage orders No. 7-63, Wages, Hours, and Working Conditions for Women and Minors in the Mercantile Industry (Aug. 30, 1963) section 18; No. 7-57, Wages, Hours, and Working Conditions for Women and Minors in the Mercantile Industry (Nov. 15, 1957) section 18; and No. 1-52, Wages, Hours, and Working Conditions for Women and Minors in the Manufacturing and the Mercantile Industries (Aug. 1, 1952) section 18.

[6]     The provision stated:  "(a) All working female employees shall be provided with suitable seats when the nature of the work permits.  [¶]  (b) When female employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed adjacent to the work area and employees shall be permitted to use such seats." (IWC wage order No. 7-68, Wages, Hours, and Working Conditions for Women and Minors in the Mercantile Industry, *supra*, § 18.)

actively engaged in those duties were permitted use of seats placed in "reasonable proximity to the work area."  (*Id.*, § 14, subd. (B).)  The IWC modified section 14, subdivision (B) in 1980 to add that employees shall be permitted the use of a seat "when it does not interfere with the performance of their duties."  (IWC wage order No. 7-80, Wages, Hours, and Working Conditions in the Mercantile Industry (Jan 1, 1980) § 14, former Cal. Admin. Code, tit. 8, § 11215-14, subd. (B).)

### C.  Prior Statements by DLSE and the IWC

The Division of Labor Standards Enforcement (DLSE), headed by the Labor Commissioner, is authorized to enforce California's labor laws.  (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 563; see Lab. Code, § 79 et seq.)  We have concluded that the DLSE's enforcement policies are not entitled to *deference* because they were not adopted in compliance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.).  (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568-577; see *Peabody v. Time Warner Cable, Inc.* (2014) 59 Cal.4th 662, 670; *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581-582.)  Nonetheless, while "interpretations that arise in the course of case-specific adjudication are not regulations . . . they may be persuasive as precedents in similar subsequent cases."  (*Tidewater*, at p. 571.)  Thus, we generally consider DLSE opinion letters with respect (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 190), noting that such letters " ' " ' "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " ' " (*Brinker, supra,* 53 Cal.4th at p. 1029, fn. 11.)

The parties refer to opinion letters written by the DLSE and the IWC.  One letter responded to a parent whose daughter was working as a department store gift wrapper.  The parent complained that her daughter had not been given a seat for use when not working, and that a chair brought in by another employee was

promptly removed by management. An IWC officer responded in part: "There is no minimum number of seats required if the nature of the work does not reasonably permit the use of seats, but the number should be 'adequate' to the number of employees. It may be that the nature of the work <u>would</u> reasonably permit employees to sit on stools at their work, in which case '<u>All working employees should be provided with suitable seats</u>.' An investigator from the Division of Labor Standards Enforcement would have to make the judgments involved." (IWC Officer Margaret T. Miller, letter to Mrs. Dora B. Finley, Dec. 28, 1979.)

Other correspondence addressed salespersons. An employees union sought clarification of section 14 in light of a department store policy that chairs would be provided to employees on breaks, not to those sales employees who were on duty but "not actually engaged in a sale." The same IWC executive officer responded: "The intent of the Commission, long established in the record, is that the requirement to provide seats applies to employees at work during their working time, not during meal and rest periods. The Commission's Statement of the Basis for the Seats Section of the 1976 orders . . . states in part: 'It continues to find that humane considerations for the welfare of employees requires that they be allowed to sit at their work or between operations when it is feasible for them to do so, as provided in (B).' [¶] The Commission added the word 'feasible' at the request of employers so as to minimize the need to apply for special exemptions. With this provision, it is up to the Division of Labor Standards Enforcement (DLSE) to inspect a facility and consider its particular situation." (IWC Executive Officer Margaret T. Miller, letter to Richard M. Williams, Secretary-Treasurer Department Store Employees Union, May 4, 1982.)

In response to another inquiry, a DLSE chief deputy labor commissioner issued a letter concerning salespersons. The letter explained that section 14 "was

10

originally established to cover situations where the work is usually performed in a sitting position with machinery, tools or other equipment. It was not intended to cover those positions where the duties require employees to be on their feet, such as salespersons in the mercantile industry." (DLSE Chief Deputy Labor Comr. Albert J. Reyff, letter to Ms. Jacqueline L. Soufi, Dec. 5, 1986.) The letter continued: "Historically and traditionally, salespersons have been expected to be in a position to greet customers, move freely throughout the store to answer questions and assist customers in their purchases. [¶] Many positions do require employees to be standing for long periods of time. Some employees are required to perform relatively laborious work, which has resulted in the establishment of mandatory rest periods." (*Ibid.*) In a followup letter, an IWC executive officer elaborated that "[t]he nature of work for salespersons is such that it requires them to be mobile and . . . to be in a position to greet customers and move freely throughout the store." (IWC Executive Officer Karla Yates, letter to Jacqueline L. Soufi, Jan. 13, 1987.)

Finally, the DLSE filed an amicus curiae brief in *Garvey v. Kmart Corp.* (N.D.Cal. Dec. 18, 2012, No. CV 11-02575 WHA) 2012 WL 6599534 (*Garvey*), a federal class action suit claiming Kmart cashiers were entitled, under section 14(A), to seats while working. The DLSE emphasized reasonableness as the guiding standard: "If called upon to enforce Section 14, DLSE would apply a reasonableness standard that would fully consider all existing conditions regarding the nature of the work performed by employees. Upon an examination of the nature of the work, DLSE would determine whether the work *reasonably* permits the use of seats for working employees under subsection (A) of Section 14, and whether proximate seating has been provided for employees not engaged in active duties when such employees are otherwise required to stand under subsection (B)." The DLSE "would consider all available facts and conditions, including but

11

not limited to the physical layout of the workplace and the employee's job functions, to determine compliance with Section 14 requirements." The DLSE would also "consider the views of the employer as to the nature of the work but these views would not be controlling." "Under a reasonableness standard, business judgments are relevant in determining the overall appropriateness of providing seating but cannot control or otherwise provide a basis for defeating the remedial purpose of the regulation."

### D. DLSE's Amicus Curiae Brief

The DLSE filed an amicus curiae brief in this case addressing the Ninth Circuit's certified questions. Regarding what tasks should be considered in assessing whether the "nature of the work reasonably permits the use of seats," the DLSE observes that its "long enforcement history teaches the danger of applying a standard pertaining to an employee's duties based upon characterizations in the abstract, or reliance upon job titles or job descriptions which may or may not reflect actual work performed by employees." Thus, the focus should be on actual tasks performed, or reasonably expected, throughout the day. Further, "DLSE submits that the seating issue can be more limited to particular duties or tasks where the 'nature of the work' giving rise to the seating requirement can be evaluated. Even where performance of other duties during the workday may be relevant to the duties or tasks directly in issue, the inquiry is typically more appropriately focused on particular duties or tasks from which the seating requirement arises."

In this context, the DLSE urges rejecting a "holistic" examination of an employee's entire range of duties, noting that it would be an unworkable analysis when an employee performs "a single core task for several hours in a fixed or defined area, where the nature of that work reasonably allows for seating, and who

12

also performs tasks for a significant part of the workday requiring movement or mobility in several locations." The DLSE urges that "it is the *nature of the work that gives rise to the issue of seating* which determines the scope of inquiry in a particular case. Accordingly, where duties and tasks may be more varied, or where any one task occupies a significant amount of time relative to other duties, this may warrant an appropriate closer examination of the pertinent individual duty or task."

### E. The "nature of the work"

As we would in interpreting a statute, we begin by examining the words of the wage order as the best indicator of the IWC's intent. (See *Brinker*, *supra*, 53 Cal.4th at p. 1027; *Martinez v. Combs* (2010) 49 Cal.4th 35, 63.) Both Wage Order No. 4-2001, section 14(A) and Wage Order No. 7-2001, section 14(A) (hereafter, collectively, section 14(A)) require "suitable seats" for working employees "when the nature of the work reasonably permits the use of seats." Questions about the "nature of the work" and when that work "reasonably permits the use of seats" are analytically distinct. Yet, the answers to those questions are necessarily intertwined. What constitutes the "nature of the work" under section 14(A) cannot be meaningfully answered without consideration of the underlying purposes of the seating requirement, in light of the objective standards imposed by the wage orders.

Defendants argue that examining when the "nature of the work reasonably permits the use of seats" requires consideration of an employee's job as a whole, i.e., a "holistic" consideration of *all* of an employee's tasks and duties throughout a shift. Under defendants' view, deciding whether an employee is entitled to a seat under section 14(A) would require weighing all of an employee's "standing" tasks against all of the "sitting" tasks. If this weighing of tasks favored providing

13

a seat, the job would be classified a "sitting" job and the employee would be provided a seat. Otherwise, the job would be classified a "standing" job and the employee would be entitled to a seat only under section 14, subdivision (B) of Wage Orders No. 4-2001 and No. 7-2001 (hereafter, collectively, section 14(B)).

Defendants' argument sweeps too broadly and is inconsistent with the purpose of the seating requirement. As discussed, the IWC's wage orders were promulgated to provide a minimum level of protection for workers. The requirement's history reflects a determination by the IWC that "humane consideration for the welfare of employees requires that they be allowed to sit at their work or between operations when it is feasible for them to do so." (IWC, Statement of Findings by the Industrial Welfare Commission of the State of Cal. in Connection with the Revision in 1976 of its Orders Regulating Wages, Hours, and Working Conditions (Aug. 13, 1976) p. 15.) Defendants' proposed consideration of *all* tasks included in an employee's job description ignores the duration of those tasks, as well as where, and how often, they are performed. This all-or-nothing approach could deprive an employee of a seat because most of his job duties are classified as "standing" tasks, even though the duration, frequency, and location of the employee's most common tasks would make seated work feasible while performing them. There is no principled reason for denying an employee a seat when he spends a substantial part of his workday at a single location performing tasks that could reasonably be done while seated, merely because his job duties include other tasks that must be done standing.

Further, defendants' view could also result in different seating requirements for employees with different duties and job descriptions *while they perform the same work*. Consider an employee who spends most of his day stocking shelves, for which he must stand, but who occasionally assists at a cash register during busy periods. Under defendants' approach, though cash register duty may feasibly

14

be performed while seated, this employee would not be entitled to a seat under section 14(A) while working at the cash register. Yet, another employee who spends most of his day at the cash register *would* be entitled to a seat there. Nothing in the language or history of the seating requirement allows such disparate treatment of employees performing the same tasks. Defendants' approach also shifts the focus away from the nature of the work to particular assignments given to an individual employee. (See pt. II.F.3., *post*.) The inquiry does not turn on the individual assignments given to each employee, but on consideration of the overall job duties performed at the particular location by *any* employee while working there, and whether those tasks reasonably permit seated work.

On the other hand, plaintiffs argue that whether the "nature of the work reasonably permits the use of seats" turns on a task-by-task evaluation of whether *a single task* may feasibly be performed seated. This view is too narrow and likewise inconsistent with the language and history of section 14(A). As discussed, the IWC modified the language now in section 14(A) in 1976 to add the word "reasonably" before the phrase "permits the use of seats." The IWC explained in its accompanying findings: "The requirement for 'suitable' seats 'where the nature of the work permits' has long been a provision of I.W.C. orders and has proved to be useful and workable as the Division has reasonably enforced it. Testimony in public hearing made it clear that some kinds of work places would be covered by the new orders that were not covered by previous orders, and the Commission has made its requirement more flexible and more subject to administrative judgment as to what is reasonable." (IWC, Statement of Findings by the Industrial Welfare Commission of the State of Cal. in Connection with the Revision in 1976 of its Orders Regulating Wages, Hours, and Working Conditions, *supra*, at p. 15.)

The seating requirement has always been "reasonably enforced," and the 1976 modification only made explicit what was implicit in its enforcement history. The seating requirement has never been understood as absolute or doctrinaire. Plaintiffs' proposed examination of individual tasks in isolation is inconsistent with the flexibility envisioned by the IWC's reasonableness standard. Under this approach, if any single task could be performed while seated, an employee would be entitled to a seat, even if the duration and frequency of the seated task is negligible. That approach also fails to account for whether being seated would unduly interfere with other standing tasks or the quality and effectiveness of overall job performance. The reasonableness standard, and its attendant flexibility, was intended to balance an employee's need for a seat with an employer's considerations of practicability and feasibility.

When evaluating whether the "nature of the work reasonably permits the use of seats," courts must examine subsets of an employee's total tasks and duties by location, such as those performed at a cash register or a teller window, and consider whether it is feasible for an employee to perform each set of location-specific tasks while seated. Courts should look to the actual tasks performed, or reasonably expected to be performed, not to abstract characterizations, job titles, or descriptions that may or may not reflect the actual work performed. Tasks performed with more frequency or for a longer duration would be more germane to the seating inquiry than tasks performed briefly or infrequently.

A focus on actual work done and tasks grouped by their location alleviates the problems created by both plaintiffs' and defendants' approaches. An employee may be entitled to a seat to perform tasks at a particular location even if his job duties include other standing tasks, so long as provision of a seat would not interfere with performance of standing tasks. At the same time, consideration of all the actual tasks performed at a particular location would allow the court to

16

consider the relationship between the standing and sitting tasks done there, the frequency and duration of those tasks with respect to each other, and whether sitting, or the frequency of transition between sitting and standing, would unreasonably interfere with other standing tasks or the quality and effectiveness of overall job performance.

We clarify that, contrary to defendants' suggestion, the requirements of sections 14(A) and 14(B) are *not* mutually exclusive in terms of the protections afforded to a particular employee. Both provisions may apply at various times during the workday, though not at the *same* time. As noted, section 14(B) states that when "employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties." As plaintiffs observe, the IWC has stated that section 14(B) applies during "lulls in operation" when an employee, while still on the job, is not then actively engaged in *any* duties. (IWC, 1976 Wage Orders, Summary of Basic Provisions, Seats, p. 3.) Taking the two provisions together, if an employee's actual tasks at a discrete location make seated work feasible, he is entitled to a seat under section 14(A) while working there. However, if other job duties take him to a different location where he must perform standing tasks, he would be entitled to a seat under 14(B) during "lulls in operation." Although the seating inquiries under sections 14(A) and 14(B) are analytically different, the seat provided to an employee under section 14(A) may satisfy the requirement of section 14(B) to the extent it is within "reasonable proximity to the work area" (§ 14(B)) and is available when work is not required to be performed.

In sum, the "nature of the work" under section 14(A) would include an employee's actual or expected tasks. If tasks are performed at a discrete location,

17

those tasks should be considered together in evaluating whether work there reasonably permits use of a seat.

### F.  "[R]easonably permits"

The Ninth Circuit's second certified question originally asked whether various factors, including "the employer's business judgment as to whether the employee should stand, the physical layout of the workplace, or the physical characteristics of the employee," should be considered in determining whether the nature of the work reasonably permits the use of a seat.  Before addressing that question, we set out a basic framework for evaluating whether the nature of the work "reasonably permits" use of a seat.  As noted, the IWC modified the seating requirement in 1976 to expressly incorporate a reasonableness standard.  This change made explicit that, although the seating requirement was meant to protect workers, its implementation was not absolute and would take into account the feasibility and practicability of providing a seat in that particular context.

Whether an employee is entitled to a seat under section 14(A) depends on the totality of the circumstances.  Analysis begins with an examination of the relevant tasks, grouped by location, and whether the tasks can be performed while seated or require standing.  This task-based assessment is also balanced against considerations of feasibility.  Feasibility may include, for example, an assessment of whether providing a seat would unduly interfere with other standing tasks, whether the frequency of transition from sitting to standing may interfere with the work, or whether seated work would impact the quality and effectiveness of overall job performance.  This inquiry is not a rigid quantitative analysis based merely upon the counting of tasks or amount of time spent performing them.  Instead, it involves a qualitative assessment of all relevant factors.

The totality of the circumstances approach has long been applied by the IWC and DLSE. In its response to the parent inquiry about her daughter's work as a gift wrapper, the IWC observed that the employee might be entitled to a seat if the nature of the work permitted it, and that "[a]n investigator from the Division of Labor Standards Enforcement would have to make the judgments involved." (IWC Officer Margaret T. Miller, letter to Mrs. Dora B. Finley, *supra*, at p. 1.) Likewise, the IWC, responding to a question about sales clerk seating, noted that its 1976 statement of findings incorporated a feasibility standard, and "[t]he Commission added the word 'feasible' at the request of employers so as to minimize the need to apply for special exemptions. With this provision, it is up to the Division of Labor Standards Enforcement (DLSE) to inspect a facility and consider its particular situation." (IWC Executive Officer Margaret T. Miller, letter to Richard M. Williams, Secretary-Treasurer Department Store Employees Union, *supra*, at p. 1.) These letters confirm that a given determination necessarily entails a careful assessment of the particular circumstances.

The DLSE's amicus curiae briefing both here and in *Garvey* is consistent with this general framework. The DLSE stated in its *Garvey* briefing that "[i]f called upon to enforce Section 14, DLSE would apply a reasonableness standard that would fully consider all existing conditions regarding the nature of the work performed by employees." Similarly, the DLSE here states that "various facts and conditions, including the physical layout of the workplace, and information from both the employer and employee regarding duties or tasks which give rise to application of the requirement must be objectively assessed and applied in a reasonable and practical manner."

The totality of the circumstances test differs from defendants' "holistic" approach. As discussed, we reject that approach because it would consider *all* of an employee's tasks regardless of the frequency, duration, and location of those

19

tasks, and would result in an all-or-nothing resolution of seating entitlement. Instead, tasks should be considered together based upon the discrete location where the tasks are performed. For each location where seating may be sought, the totality of the circumstances test simply recognizes that numerous factors, such as the frequency and duration of tasks, as well as the feasibility and practicability of providing seating, may play a role in the ultimate conclusion. The weight given to any relevant factor will depend upon the attendant circumstances. We now address the role of particular factors identified by the Ninth Circuit.

### 1. Business judgment

CVS suggests that an employer's business judgment as to whether the work should be performed while standing, while not controlling, "must be accorded deference," and the relevant inquiry is whether the reasons for such judgment "are legitimate or pretextual." Chase argues that such business judgment is a relevant factor in determining whether the nature of the work reasonably permits a seat. Both employers contend their judgment that employees provide better customer service while standing, or at least that employees are perceived by customers to provide better service, should be considered. Plaintiffs counter that business judgment should play no part in the inquiry, suggesting that whether the work reasonably permits a seat be evaluated "based on the objective physical requirements of the task or set of tasks for which seating is sought." They argue that "[w]hile companies like CVS and Chase may believe that their customers prefer a standing cashier or teller, nothing about the 'nature' of cashier or teller work requires standing."

There is no question that an employer may define the duties to be performed by an employee. As the DLSE observes, "[a]n employer's business judgment largely determines the nature of work of the employee both generally, as

20

well as duties or tasks specifically." Contrary to plaintiffs' suggestion, such duties are not limited to physical tasks. Providing a certain level of customer service *is* an objective job duty that an employer may reasonably expect. An employee's duty to provide a certain level of customer service should be assessed, along with other relevant tasks and obligations, in determining whether the nature of the work reasonably permits use of a seat at a particular location. Providing "customer service" is an objective job function comprised of different tasks, e.g., assisting customers with purchases, answering questions, locating inventory, creating a welcoming environment, etc.

However, "business judgment" in this sense does not encompass an employer's *mere preference* that particular tasks be performed while standing. The standard is an objective one. An employer's evaluation of the quality and effectiveness of overall job performance is among the factors that can be objectively considered in light of the overall aims of the regulatory scheme, which has always been employee protection. An objective inquiry properly takes into account an employer's reasonable expectations regarding customer service and acknowledges an employer's role in setting job duties. It also takes into account any evidence submitted by the parties bearing on an employer's view that an objective job duty is best accomplished standing. It protects employees because it does not allow employers unlimited ability to arbitrarily define certain tasks as "standing" ones, undermining the protective purpose of the wage order.

## 2. Physical layout

Plaintiffs assert that "the existing physical configuration of an employee's workspace should have no bearing on whether the nature of the employee's work reasonably permits the use of seats." Defendants urge that workspace layout is a relevant factor.

21

We conclude the physical layout of a workspace may be relevant in the totality of the circumstances inquiry. As discussed, an employer's expectations define the duties of an employee. Those duties are usually discharged in a particular physical space owned or rented by the employer. To look only at an employee's physical tasks in the abstract, as plaintiffs suggest, may ignore an important aspect of what both employer and employee believe a job entails. A workspace's physical layout may inform the expectations of both the employer and employee with respect to job duties. To the extent it does, the physical workspace would be relevant in defining an employee's job duties and should be accounted for in the totality of the circumstances inquiry.

On the other hand, just as an employer's mere preference for standing cannot constitute a relevant "business judgment" requiring deference, an employer may not unreasonably design a workspace to further a preference for standing or to deny a seat that might otherwise be reasonably suited for the contemplated tasks. As the DLSE observes in its amicus curiae brief, the seating requirement is "a workplace condition aimed at the welfare of employees performing work and not an 'engineering' or technically-based standard," and "[w]hile facts regarding technical aspects of workplace configurations or studies may be relevant to determining whether suitable seating can be provided, the application of the standard is essentially one of overall reasonableness applied to the particular facts." As the DLSE suggests, reasonableness remains the ultimate touchstone. Evidence that seats are used to perform similar tasks under other, similar workspace conditions may be relevant to the inquiry, and to whether the physical layout may reasonably be changed to accommodate a seat. As the DLSE states, reasonableness must be based on the particular circumstances.

Defendants argue in this context that the DLSE's inaction in enforcing the seating requirement reflects a tacit conclusion that seats are not required for bank

22

tellers and retail cashiers.  We disagree.  "[A]n agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred."  (*Christopher v. SmithKline Beecham Corp.* (2012) __ U.S. __ [132 S.Ct. 2156, 2168].)  Defendants' views are inconsistent with the purposes of the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.), which "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 360.) "The Legislature declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that *staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market*, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations . . . ."  (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980, italics added; see *Iskanian*, at p. 379.)  The IWC's and the DLSE's long-standing position has been that the seating inquiry must be made on a case-by-case basis.  Any lack of enforcement could simply have resulted from inadequate resources, insufficient staffing, or other extraneous factors.  The lack of enforcement by the DLSE is, at best, inconclusive.

### 3.  *Physical differences between employees*

CVS suggests that "physical differences among employees must be taken into consideration to determine whether employees could uniformly perform their duties with a standardized type and size of seat."[7]  Plaintiffs counter that there is

---

[7]     Chase does not raise a similar argument.

23

no rational basis for conditioning an employee's entitlement to a seat based on the employee's physical characteristics.

Plaintiffs' view is more consistent with the language and history of section 14(A). That provision requires a seat when the nature of the *work* reasonably permits it, not when the nature of the *worker* does. As the DLSE observes, the seating provision has never included language suggesting the seating inquiry turned on the particular characteristics of an employee. Nor has the seating provision ever suggested that physical differences among employees were relevant when considering whether *any* employee may work while seated. The historical focus has been on the characteristics of the particular location and the duties associated with it. This case presents no issue regarding any accommodations that may be required for particular workers under other provisions.

### G.  Burden to Show Suitable Seating is Available

Finally, plaintiffs argue they should not have the burden of proving that any particular seat is suitable under section 14(A). They assert that "[t]he employer, not the employee, has the information and resources to identify a seat that qualifies as 'suitable' for the nature of the work being performed." Plaintiffs further contend that section 14(A) "imposes a burden on employers to make suitable seats available to employees, not on employees to request a seat." Defendants counter that an inquiry into whether "the nature of the work 'reasonably permits' the use of seats" necessarily requires consideration of whether a suitable seat for the work actually exists.

Chase suggests that even when "the plaintiff can establish that the 'nature' of her work would reasonably permit the use of a seat, she must still prove that a suitable seat exists but was not provided. The 'suitable seat' requirement is an *independent element* of the regulation." The independent element argument fails.

24

Section 14(A) expressly states that "[a]ll working employees *shall be provided with suitable seats* when the nature of the work reasonably permits the use of seats." (Italics added.) Contrary to Chase's argument, if the nature of the work reasonably permits seated work, section 14(A) unambiguously states employees "shall be provided with suitable seats." There is no language suggesting that an employee must additionally show a particular type of seat would fulfill that requirement. An employer seeking to be excused from the requirement bears the burden of showing compliance is infeasible because no suitable seating exists.

### III. CONCLUSION

Accordingly, we answer the certified questions as set out at page 2, *ante*, as amplified by our subsequent discussion.

CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Kilby v. CVS Pharmacy, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX – on certification pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S215614
**Date Filed:** April 4, 2016

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

Kevin J. McInerney; Arias Ozzello & Gignac, Mark A. Ozzello, Mike M. Arias; Capstone Law, Raul Perez, Suzy E. Lee; Sullivan Law Group, Eric K. Yaeckel, Altshuler Berzon, Michael Rubin, Connie K. Chan; Dostart Hannink & Coveney, James T. Hannink, Zach P. Dostart; Clapp Legal, James F. Clapp; Righetti Glugoski and Matthew Righetti for Plaintiffs and Appellants.

Law Offices of Miles Locker and Miles E. Locker for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Barbara A. Jones and Dan Kohrman for AARP as Amicus Curiae on behalf of Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, Timothy J. Long, Michael D. Weil and Leah L. Spero for Defendant and Respondent CVS Pharmacy, Inc.

Thomas M. Peterson; Sam S. Shaulson; Morgan, Lewis & Bockius, Carrie A. Gonell, John D. Hayashi and Alexander L. Grodan for Defendant and Respondent JPMorgan Chase Bank, N.A.

Munger, Tolles & Olson, Malcolm A. Heinicke and Katherine M. Forster for Chamber of Commerce of the United States of American and California Chamber of Commerce as Amici Curiae on behalf of Defendants and Respondents.

Paul Hastings, Paul W. Cane, Jr., Rishi N. Sharma, Paul Grossman and Leslie L. Abbot for California Employment Law Council as Amicus Curiae on behalf of Defendants and Respondents.

Fox Rothschild, David F. Faustman and Cristina K. Armstrong for Retail Litigation Center., Inc., and California Retailers Association as Amici Curiae on behalf of Defendants and Respondents.

Sheppard, Mullin, Richter & Hampton, David B. Chidlaw, Samantha D. Hardy, Guylyn R. Cummins and Daniel F. De La Cruz for National Retail Federation as Amicus Curiae on behalf of Defendants and Respondents.

**Page 2 – S215614 – counsel continued**

**Counsel:**

Gibson, Dunn & Crutcher, Rachel S. Brass, Theodore J. Boutrous, Jr., Catherine A. Conway and Jesse A. Cripps for Wal-Mart Stores, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

Robert N. Villalovos for Division of Labor Standards Enforcement, Department of Industrial Relations as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael Rubin
Altshuler Berzon
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

Timothy J. Long
Orrick, Herrington & Sutcliffe
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4407
(916) 329-7919