Filed 11/30/23  Luckett v. McDonald's Restaurants of California CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| ROOSEVELT LUCKETT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MCDONALD'S RESTAURANTS OF CALIFORNIA, INC. et al.,<br><br>    Defendants and Respondents. | B317481<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV05066)<br><br>**REDACTED OPINION FOR PUBLIC VIEW**\* |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

---

\* This case involves material from a sealed record.  In accordance with Civil Code section 3426.5 and California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We order the unredacted version of this opinion sealed.

The deRubertis Law Firm, David M. deRubertis, Joshua M. Webster; Lavi & Ebrahimian, Joseph Lavi and Jordan D. Bello for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Theane D. Evangelis, Bradley J. Hamburger, Lauren Blas; Jones Day, Amanda C. Sommerfeld and Amanda W. Molinari for Defendants and Respondents.

———————————

Plaintiff Roosevelt Luckett sued his former employer, McDonald's Restaurants of California, Inc. (McDonald's or Defendant) under the Private Attorneys General Act of 2004 (PAGA; Lab. Code, § 2698 et seq.). Luckett alleged McDonald's violated Industrial Welfare Commission Wage Order No. 5-2001, section 14(A), which requires employers to provide suitable seats to their employees "when the nature of the work reasonably permits the use of seats," and section 14(B), which requires an employer to provide suitable seats in reasonable proximity of the work area for employees to use during lulls in operation. (Cal. Code Regs., tit. 8, § 11050, subd. 14(A) &(B) [Wage Order No. 5-2001]; *Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1, 19 (*Kilby*).)

McDonald's moved for summary judgment. Its arguments included the following three: First, there was no factual dispute that the nature of the work did not reasonably permit the use of a seat at its drive-thru cash booths. Second, even if the nature of the work did so permit, there was no factual dispute that there was no "suitable" seat for the drive-thru cash booth. Third, Luckett failed to exhaust administrative remedies as required under PAGA with respect to his section 14(B) claim and thus, the claim was time barred. The trial court granted the motion,

2

finding there was no triable issue of fact for these three issues and concluding that the remaining issues were moot.

Luckett argues triable issues of material fact existed as to each of the three matters and the trial court erroneously weighed evidence and adjudicated conflicts in favor of McDonald's. To attempt establishing a triable issue that the nature of drive-thru cash booth work permits seating and that suitable seats exist, Luckett primarily relies on evidence that McDonald's accommodated employees with medical conditions by modifying their drive-thru cash booth job duties and permitting them to sit. But accommodating such disabled and injured employees did not create a factual dispute regarding the more expansive tasks expected of full-time, non-disabled employees that are incompatible with sitting. We conclude Luckett's inapposite evidence did not demonstrate a triable issue, and thus affirm.

## FACTUAL AND PROCEDRAL BACKGROUND

### A. Legal Background

Wage Order No. 5-2001 section 14(A) requires that "All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats." Section 14(B) states, "When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties." (Wage Order No. 5-2001.)

### B. Luckett's Lawsuit

Luckett worked for a McDonald's restaurant located on Venice Boulevard in Los Angeles, California from February 14,

2018 to February 12, 2019.  From time to time, Luckett worked in the drive-thru cash booth.  Luckett asked whether he could use a seat in the drive-thru cash booth, and McDonald's denied his request.

On October 24, 2019, Luckett provided notice to the Labor and Workforce Development Agency (LWDA) that McDonald's "failed to comply with the requirements of [s]ection 14(A) of Wage Order [No.] 5[-2001] by failing to provide suitable seating [to] him and other current and former 'aggrieved' hourly paid non-exempt employees in California who worked as cashiers and/or who performed other duties that reasonably permitted the use of seats . . . ."  Luckett also stated that pursuant to *Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, "[e]mployers are subject to civil penalties under PAGA for any other violation of the California Labor Code" involving their employees.

On February 7, 2020, Luckett filed a complaint for civil penalties under PAGA.  Luckett sought to bring the action on behalf of himself and other former or current McDonald's employees who were aggrieved under section 14 by McDonald's failure to provide suitable seating when the nature of the work reasonably permitted the use of seats.

On October 9, 2020, Luckett submitted further notice to the LWDA "to clarify that [his] allegations regarding McDonald's failure to provide suitable seating arise under both [sections] 14(A) and 14(B) of the applicable [w]age [o]rder."  The notice stated, "Mr. Luckett further alleges that McDonald's failed to comply with the requirements of [s]ection 14(B) of Wage Order [No.] 5[-2001] when Mr. Luckett and other drive-thru cashiers were not engaged in the active duties of their employment and

4

the nature of the work required standing by failing to place an adequate number of suitable seats in reasonable proximity to the work area and failing to permit employees' use of such seats when it did not interfere with the performance of their duties."

On November 9, 2020, Luckett filed a first amended complaint to include an allegation under section 14(B).

## C.     Defendant's Motion for Summary Judgment

On April 8, 2021, McDonald's filed a motion for summary judgment, or in the alternative, summary adjudication. It made six arguments. First, McDonald's argued there was no factual dispute that the nature of the work did not reasonably permit the use of a seat at its drive-thru cash booths. It argued the booths were a tight workspace, designed for standing, and the fluidity of movement required to service customers (including frequent foot movements, reaching, bending, shifting, and twisting) could not be reasonably performed from a seated position. Additionally, placing a seat in the booth would create a tripping hazard and ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████. Placing a seat in the drive-thru cash booth would also require cashiers to transition from sitting to standing, ████████████████████████████████████ ███████████████████████████████████████████ ████████.

Second, McDonald's argued that even if the nature of the work did reasonably permit use of a seat, there was no factual dispute that there was no "suitable" seat for the drive-thru cash booth.

Third, McDonald's argued that Luckett failed to exhaust administrative remedies as required under PAGA with respect to

5

his section 14(B) claim and thus, the claim was procedurally barred. Fourth and fifth, even if Luckett's section 14(B) claim was not barred, it failed because it was undisputed that there were no "inactive" periods of work, and even if there were "inactive" periods, it was undisputed that placing a seat in the drive-thru cash booth was a tripping hazard and would interfere with the performance of duties. Sixth, McDonald's argued Luckett lacked standing to pursue the lawsuit because he could not show that he personally experienced a violation of the law.

Defendant's evidentiary submission in support of its motion included among other things the declaration of its operations manager in California since January 2013, Saad Sabbagh,[1] the declaration of McDonald's then-director of customer experience, Michael Cramer, and the report of a retained ergonomics expert, Jeffrey Fernandez, PhD.

1. *Drive-thru Cash Booth Employee Tasks*

It is undisputed that in December 2018, Defendant operated approximately 78 corporate McDonald's restaurants in California with drive-thru cash booths.[2] According to Sabbagh, Defendant staffed each shift at each restaurant with between three and 21 employees. Employees could work at a variety of

---

[1] Sabbagh began working for McDonald's USA, LLC in 1994. He became the operations manager in California in January 2013, and was responsible for 28 California corporate-owned McDonald's restaurants. Sabbagh oversaw the operation of those restaurants, including ensuring service and safety standards for customers and employees.

[2] During the relevant period, one store closed and another was sold.

locations within the restaurant, including the front counter, the grill, the fries station, the drive-thru cash booth, or the presenter booth.  The drive-thru cash booth is where drive-thru customers' orders are received and where customers pay for their orders.  The presenter's booth is a second window where customers receive their food.

Drive-thru cash booth employees have primary and secondary duties.  Their primary duties include taking orders and completing payment transactions for drive-thru customers, and providing "excellent customer service" while doing so.  For example, Sabbagh observed, "It is McDonald's expectation that employees in the cash booth reach out to customers who are sitting in their vehicles, rather than make our guests take off their seat belts, stretch, or open their vehicle doors to reach in toward the employee during a payment transaction."  (Italics omitted.)  Sabbagh also declared that McDonald's places great emphasis on the guest experience and speed of service.  Therefore, McDonald's tracks the speed of service for each restaurant and provides training regarding how to diagnose and fix slowdowns.

Sabbagh declared that McDonald's "provide[s] employees with formal meal and rest breaks, as well as time to get a drink, use the restroom, and wash their hands during their shifts, as needed.  There is seating in the crew break room to ensure that employees are able to sit and rest during their formal breaks (i.e., those required by State law).  Additionally, during the COVID-19 [p]andemic and dining room closures, employees may also use seating in the restaurant lobbies and dining rooms during formal breaks to allow for employee social distancing.  However, generally speaking, outside of these breaks, it is not acceptable to

7

McDonald's for an employee to be sitting down and doing nothing while on duty—except, perhaps, as an accommodation for a medical issue." Thus, to provide the requisite level of service, McDonald's expects its employees to remain busy between customer transactions by performing secondary duties.

Secondary duties vary from restaurant to restaurant and can include activities both within and outside of the drive-thru cash booth. Secondary duties within the cash booth may include, for example, assembling condiment bags or Happy Meals boxes, cleaning used service trays, cleaning the cash booth, stocking the cash booth with secondary work items, changing out the cash register drawer, re-loading the cash register and receipt tape, and verifying cash counts.

2. *Cramer's Declaration Regarding Cash Booth Design and Business Judgment*

At the time of the motion, Cramer had been McDonald's director of customer experience since 2012. In that role, Cramer led a department that analyzed "information collected from the restaurants to identify the speed of service for [their] guests and help identify areas that need attention to continuously improve guest service." Cramer previously worked as the director of operations research for six years, during which time he and his team were responsible for the design features, layouts, and other elements of the restaurants.

According to Cramer, McDonald's specifically designed the drive-thru cash booths for fast, efficient, and ergonomically sound standing work. When carrying out their primary duties in the drive-thru cash booth, employees "need to extend one or both arms out the cash booth window to reach the guest who is seated in his or her vehicle, who will be at varying distances from the

8

cash booth. Employees are best able to reach the guest to collect and return forms of payment from a standing position. Moreover, these reaches are done with a fluid movement and require that employees are able to rotate 90 degrees, as the employee is often multitasking by taking the next guest's order through their headset and using the order touchscreen, then alternating to the payment touchscreen to process payment for the guest at the cash booth window." (Fn. omitted.)

Although Cramer's team considered placing a seat in the cash booth, it determined that from an ergonomics perspective, the drive-thru cash booth job was most safely and efficiently performed from a standing position. Consequently, the height of the work table in the drive-thru cash booth is appropriate for standing work. Cramer's team concluded that with varying operating conditions and frequent changes to activities in that workspace, a seat would be in the employee's way and pose a trip hazard as the employee maneuvered within the cash booth, particularly when more than one employee was in the booth at a time.

Cramer also declared that McDonald's "measured many aspects of the guest experience and studied process improvements to ensure that it is providing the best service experience possible to its guests." His team "leverage[d] information collected from the restaurants to identify the speed of service for [their] guests and help identify areas that need attention to continuously improve guest service." █████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████ He declared, "we know that if the

line of cars at the [d]rive-[t]hru is perceived to be too long, people may turn away from the [d]rive-[t]hru."

Based upon a guest complaint hotline, McDonald's determined that guests are less likely to return if they are dissatisfied with key elements of their service, including speed.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████

3.   *Luckett's Testimony Included with Defendant's Motion*

Luckett testified that as a drive-thru cashier, he placed the customer's order by keying it into a touch screen. When the customer got to the cashier booth, he repeated the order, and collected payment. He agreed that vehicles pulled up to the window at varying distances. When asked whether he would "reach out the window to grab" the cash or credit card from the customer if they were too far away, Luckett responded, yes. Luckett later testified, however, that most of the time when customers were too far from the window, the customers would get out their cars to provide him with payment. He only leaned out so that the customer would not have to get out of his or her car

10

"once or twice" during his employment. Luckett would then provide change if appropriate and ask whether the customer wanted a receipt. If so, he would hand them the receipt. He also testified that he sometimes had to lean out the window to hear customers. Luckett acknowledged that customers will leave the drive-thru line when they feel that it is taking too long.

4. *Dr. Fernandez's Opinions*

McDonald's retained Dr. Fernandez to consider whether the tasks performed by the drive-thru cashier booth employees reasonably permitted the use of a seat from an ergonomics perspective. He was also to determine whether any commercially available seating option would be ergonomically suitable for the cash booths—██████████████████████████████████████
██████████

  ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████

  ██████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████



---

[3] Dr. Fernandez and McDonald's observed that the COVID-19 pandemic and the resulting closure of in-restaurant dining increased the number of drive-thru transactions. Additionally, elevated safety standards as a result of the pandemic required increased cleaning procedures and the use of hand mounts on credit card readers, cash boxes to collect or return cash to the customers, plexiglass between the cash booth employees and guests, and ██████████████████████████████████ ████████████████████████████████████████ ████████.





[REDACTED]

### 5. *Sitting Accommodation*

Because the work in the cash booth is most appropriately done from a standing position, McDonald's generally only allows employees to sit as an accommodation for medical reasons. Sabbagh declared that "[i]n order to do this, . . . [McDonald's] will accept a temporary reduction in performance expectations for injured or disabled employees in the cash booth by excusing them from some or all of their secondary duties, and relaxing expectations as to speed and efficiency." Similarly, Cramer stated that when accommodating employees by permitting use of a seat in the drive-thru cash booth, McDonald's relaxes its "expectations for frequency of movement, speed, and performance of secondary duties." In determining whether an employee may be accommodated with a seat in the cash booth, McDonald's management and human resources will evaluate and balance on a case-by-case basis the desire to enable injured employees to continue to work with the needs of the business, considering staffing levels, space constraints within the cash booth,

15

availability of access to secondary duties, whether secondary duties should be reallocated to other employees, and the length of time the accommodation may be needed.  According to Sabbagh, however, "McDonald's cannot allow all employees to sit all the time because of the impacts it will have on speed of service, overall guest experience, and importantly, employee safety."

## D.    Luckett's Opposition to Defendant's Motion for Summary Judgment

In opposition to the summary judgment motion, Luckett argued that McDonald's own policy ███████████████ ███████████████████████ and that McDonald's had a history of providing drive-thru cashiers with seats, demonstrating it was feasible to do so.  This argument was based on ████████████████████████████████████ ██████████████████████.  Nevertheless, Luckett asserted that McDonald's accommodation policy did not eliminate drive-thru cashier job functions.  Rather, it identified "existing job positions" with physical requirements that would allow injured employees to return to work without reaggravating their injuries. Moreover, Luckett claimed the duties in the drive-thru cashier booth required limited movement, and the accommodated employees (and another employee who decided to sit while working) evidenced that there was enough room in the drive-thru cash booth for a seat, that a suitable seat existed, and that all job functions could be performed seated.

Luckett also argued McDonald's █████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████.  Luckett argued that during discovery,



16

McDonald's denied having conducted any studies of the impact of a seat on transaction times or revenue, and that Defendant's █████████████████████████████████████████████████. Luckett further argued that Dr. Fernandez's opinion was unreliable for a number of reasons, ████████████████ █████████████████████████████████████████████████ ████████████. Luckett also argued his second notice to the LWDA related back to his first, and that his section 14(B) claim was therefore not raised outside of the statute of limitations.

In support of his opposition, Luckett submitted portions of his deposition, Sabbagh's deposition, and Dr. Fernandez's deposition, McDonald's ███████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████, Defendant's discovery responses, and declarations of 10 McDonald's employees.

1.   *McDonald's Guidance Regarding Secondary Duties*

Luckett cited McDonald's ██████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████.

██████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████

[black redaction bars]

2. *McDonald's Policy and Practice of Providing Seats, and Declarations from Three Accommodated Employees*

Luckett argued McDonald's ███████████████ ███████████████ and has a history of providing seats to its cashiers, demonstrating that doing so is feasible.  In particular, Luckett ███████████████████████████████

[black redaction bars]

Luckett argued that the purpose of Defendant's accommodation policies was to assist an injured employee to return to work without risk of further injury "by identifying existing job positions with physical requirements that align with the crew member's physical limitations." ████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ used the language "existing job position."

It is undisputed that pursuant to its policies, McDonald's provided seats to injured or disabled employees who worked in the drive-thru cash booth. Luckett submitted declarations from three employees who were so accommodated. Each of the declarants stated they were able to successfully complete their drive-thru cashier duties while seated. None of them received any complaints from customers, coworkers, or management. Each of them also stated that based upon their experience, they believed the nature of the work reasonably permitted use of a seat, and that there was enough space in the cash booth for a seat.

Sabbagh, who was deposed as McDonald's person most knowledgeable (PMK) concerning certain accommodated employees, testified that ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. Sabbagh also testified that ██████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████.

3.  *Luckett's Testimony Included with His Opposition*

Luckett testified he did not have the secondary job duties of assembling condiment packets in the cash booth although he did assemble Happy Meals boxes there. He did not recall doing any other duties as a cashier aside from customer transactions and assembling Happy Meals boxes.

Luckett also testified that one night, at approximately 11:00 p.m., he observed a night-shift drive-thru cashier at the McDonald's where he worked use a metal folding-chair. He asked the cashier why he had a chair, and the cashier responded that he had a doctor's note. Luckett watched the cashier perform approximately 15 shifts and observed that the cashier was able to perform all job functions sitting down. The cashier only stood to go on break. Luckett never saw any other cashier sit while working.

Luckett's submission also included deposition testimony clarifying that approximately four times a shift, Luckett needed to lean out the window because he could not hear the customer.

He also testified that the cash drawer, which he stated pops open two to three inches for a cash payment, will not pop open for a credit card transaction or for an Apple Pay payment. Further, he testified that not every customer requested a receipt.

### 4. *Other Employee Declarants*

Seven employee declarants stated that they worked in the cashier booth alone and that if anyone else entered the booth it was sporadic and swift. Further, they stated that standing for prolonged periods of time caused them physical discomfort. Six employees stated neither they nor anyone they observed was provided a seat to use during cashiering duties. One of the seven employees, however, "regularly grab[bed] a seat from the dining area for use" "due to the physical discomfort associated with standing for prolonged periods of time." That employee observed other employees do so as well. He declared that he and others who grabbed seats for themselves were able to successfully perform their cashiering duties[4] and did not receive complaints from customers, coworkers, or management. Further, each of the seven employees stated that based on their experience, the tasks associated with the drive-thru cashier position reasonably permitted use of a seat. "[A]lmost all" the needed equipment was within reaching distance and customers ordering at the drive-thru window "normally" positioned their vehicles close enough, so

_____

[4] In ruling on McDonald's evidentiary objections, the trial court limited its consideration of this declarant's statement about successfully performing job duties to the employee's own experience.

21

that reaching was minimal.[5]  They believed there was enough free space in the cash booth for a seat, including a stationary chair with a back rest or a stool.  Moreover, they believed the time it would take to transition between sitting and standing was minimal.

### 5.    *Dr. Fernandez's Deposition*

During his deposition, Dr. Fernandez .

During the deposition, Luckett challenged Dr. Fernandez's conclusion that ███████████████████████████████.  Dr. Fernandez ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████

---

[5] The declarants each stated that having a seat would make them more productive because they would experience less physical discomfort and fatigue from standing.  The court sustained McDonald's objection to this statement as an improper lay opinion.

In all 10 declarations, the employees stated that using a seat would not result in actual or perceived slower service times, decreased car counts, or decreased customer satisfaction.  The trial court sustained McDonald's objection to the statement on the basis that it lacked foundation and personal knowledge or called for speculation.

Luckett does not challenge any of these evidentiary rulings on appeal.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████.

Dr. Fernandez ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████.

Dr. Fernandez ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████.

6. *Studies That Providing a Seat in the Cash Booth Will Adversely Impact Service*

Luckett argued that Cramer's testimony ████████████ ████████████████████████████████████████████ ████████████████ was conjecture because Luckett asked for relevant studies during discovery and McDonald's responded that there were none.

Specifically, Luckett noticed the deposition of Defendant's PMK regarding "[a]ny studies, surveys, or other analysis conducted by Defendant, or on Defendant's behalf, regarding" (1) "customer perceptions of aggrieved employees using seats/stools at Defendant's restaurants (scope limited to the drive-thru)" and (2) "what impact, if any, the use of a seat by

aggrieved employees during the performance of their duties (scope limited to the drive-thru), would have on their productivity."  On January 11, 2021, McDonald's responded that it was not aware of any such studies.

During his PMK deposition, Sabbagh testified ███████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████

## E.    The Trial Court's Ruling

The trial court ruled there was no factual dispute that the nature of the work did not reasonably permit use of a seat in McDonald's California drive-thru booths.  The court found that the evidence demonstrated McDonald's expectations of the level of customer service that drive-thru cash booth employees were to provide were reasonable and that their job duty was best accomplished standing.  The "anecdotal" statements from Luckett and employee declarants "that they believe seating is reasonable [are] insufficient" to raise a triable issue of material fact.

The court also found there was no factual dispute that there is no suitable seat for the drive-thru cash booth.  Dr. Fernandez's ███████████████████████████████████ ████████████████████ were sufficient to shift the burden to Luckett to show a triable issue.  Luckett's evidence that McDonald's offered a range of different seats as a temporary accommodation did not address the accompanying reduction in

24

job requirements or performance expectations for such employees.

Finally, the court found that Luckett's section 14(B) claim was procedurally barred because Luckett did not provide PAGA notice to the LWDA within the one-year statute of limitations, and that his amended notice did not relate back because Luckett's first notice did not state facts supporting the claimed section 14(B) violation.

## DISCUSSION

### A. Summary Judgment Framework and Standard of Review

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment has met the "burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established." (*Id.*, subd. (p)(2); see also *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432.) Once the defendant has met that burden, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2); see also *Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1518.)

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]. 'Thus, while

25

the court in determining a motion for summary judgment does not "try" the case, the court is bound to consider the competency of the evidence presented.' [Citation.]" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197.)

We review the trial court's summary judgment ruling de novo. We liberally construe the plaintiff's evidentiary submission while strictly scrutinizing the defendant's own showing and resolve any evidentiary doubts or ambiguities in the plaintiff's favor. (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1083, citing *Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1438.)

## B. Luckett's Failure to Provide Timely Notice to the LWDA Bars His Section 14(B) Claim

Before an aggrieved employee may bring a civil action under PAGA, the employee "must provide notice to the employer and the responsible state agency 'of the specific provisions of [the Labor Code] alleged to have been violated' " as well as " 'the facts and theories to support the alleged violation.' " (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545, quoting Lab. Code, § 2699.3, subd. (a)(1)(A).) "If the agency elects not to investigate, or investigates without issuing a citation, the employee may then bring a PAGA action." (*Williams v. Superior Court*, *supra*, at p. 545, citing Lab. Code, § 2699.3, subd. (a)(2).) "The evident purpose of the notice requirement is to afford the relevant state agency, the [LWDA], the opportunity to decide whether to allocate scarce resources to an investigation, a decision better made with knowledge of the allegations an aggrieved employee is making and any basis for those allegations. Notice to the employer serves the purpose of allowing the employer to submit a response to the agency [citation], again thereby promoting an

26

informed agency decision as to whether to allocate resources toward an investigation." (*Williams v. Superior Court, supra,* at pp. 545-546.)

The parties do not dispute that PAGA required Luckett to give notice within one year of his termination date, February 12, 2019. (See *Brown v. Ralphs Grocery Co.* (2018) 28 Cal.App.5th 824, 839, citing Code Civ. Proc., § 340, subd. (a).) Rather, they dispute whether Luckett's second notice, provided on October 9, 2020, can relate back to the original notice; if it does not, the second notice is untimely.

Luckett argues *Hutcheson v. Superior Court* (2022) 74 Cal.App.5th 932 supports his argument that his section 14(B) claim can relate back. In that case, the appellate court concluded an amended PAGA complaint that sought to substitute a second employee as the named plaintiff could relate back to the original complaint. (*Id.* at p. 936.) The *Hutcheson* court acknowledged applying the relation back doctrine to PAGA claims could "frustrate the Legislature's intent to require compliance with" the notice requirement as described in *Williams v. Superior Court, supra,* 3 Cal.5th at page 546. (*Hutcheson v. Superior Court, supra,* at p. 943.) However, the purposes for such notice had been met in the case before it. (*Ibid.*) The substitution of one named plaintiff for another did "not expand the scope of the original complaint" and the defendant "has had notice since [the date of the original letter to the LWDA] of the facts and theories underlying the claims." (*Id.* at p. 941.) Thus, permitting the amended complaint to relate back would not frustrate the legislative purposes underlying the LDWA notice. (*Hutcheson v. Superior Court, supra,* at p. 943.)

27

The case before us is markedly different. Here, Luckett did not seek to substitute one plaintiff for another; he sought to add a new claim under section 14(B). Whether he is barred from doing so depends on whether his original letter sufficiently provided notice of his section 14(B) claim. (See *Hutcheson v. Superior Court, supra,* 74 Cal.App.5th at pp. 941, 943; *Esparza v. Safeway, Inc.* (2019) 36 Cal.App.5th 42, 62 ["an untimely PAGA claim may relate back to an earlier complaint only if the complaint was preceded by timely notice to the LWDA"].)

Luckett contends his October 24, 2019 letter "provided sufficient notice of the [section] 14([B]) claim by stating [McDonald's] 'fail[ed] to provide suitable seating [to] him and other current and former 'aggrieved' . . . employees in California who worked as cashiers and/or performed other duties that reasonably permitted the use of seats despite . . . the nature of their work' " because "the nature of the drive-thru cashier duties allowed for lulls in operation."

We disagree. Luckett's selective quotation fails to recite important context at the beginning of this sentence. In full, the sentence states, "Mr. Luckett maintains that [McDonald's] failed to comply with the requirements of [*s*]*ection 14(A)* of Wage Order [No.] 5[-2001] by failing to provide suitable seating [to] him and other current and former 'aggrieved' . . . employees in California who worked as cashiers and/or performed other duties that reasonably permitted the use of seats despite that the nature of their work reasonably permitted the use of seats." (Italics added.) Thus, Luckett expressly limited the scope of the violation he described to section 14(A), and neither the LWDA nor McDonald's would have reasonably read Luckett's statement as giving notice of a section 14(B) claim.

28

Even without this express limitation, Luckett's argument is without merit because section 14(B) does not apply when, as described in his October 24, 2019 letter, the nature of the work "reasonably permit[s] the use of seats." Rather, it applies to standing tasks when there is a lull in that work. Our Supreme Court explained, "Both [sections 14(A) and 14(B)] may apply at various times during the workday, though not at the *same* time. . . . [S]ection 14(B) applies during 'lulls in operation' when an employee, while still on the job, is not then actively engaged in *any* duties. [Citation.] Taking the two provisions together, if an employee's actual tasks at a discrete location make seated work feasible, he is entitled to a seat under section 14(A) while working there. However, if other job duties take him to *a different location where he must perform standing tasks*, he would be entitled to a seat under section 14(B) during 'lulls in operation.' " (*Kilby*, *supra*, 63 Cal.4th at p. 19, third italics added.)

Thus, Luckett's notice that McDonald's "fail[ed] to provide suitable seating [to persons whose] duties . . . reasonably permit[ed] the use of seats" refers in concept only to section 14(A) and did not provide sufficient notice of his section 14(B) claim. We conclude the trial court did not err in granting summary judgment on this issue. Accordingly, we need not address the merits of the parties' arguments relating to Luckett's section 14(B) claim, and our discussion below focuses only on his section 14(A) claim.

**C. The Trial Court Did Not Err in Granting Summary Judgment Because There Is No Factual Dispute that the Nature of the Work Did Not Reasonably Permit Use of a Seat**

1.  *Legal Principles*

In *Kilby*, *supra*, 63 Cal.4th 1, the Supreme Court explained, "Whether an employee is entitled to a seat under section 14(A) depends on the totality of the circumstances.  Analysis begins with an examination of the relevant tasks, grouped by location, and whether the tasks can be performed while seated or require standing.  This task-based assessment is also balanced against considerations of feasibility.  Feasibility may include, for example, an assessment of whether providing a seat would unduly interfere with other standing tasks, whether the frequency of transition from sitting to standing may interfere with the work, or whether seated work would impact the quality and effectiveness of overall job performance.  This inquiry is not a rigid quantitative analysis based merely upon the counting of tasks or amount of time spent performing them.  Instead, it involves a qualitative assessment of all relevant factors." (*Id.* at pp. 19-20.)

In identifying the "relevant tasks," "courts must examine subsets of an employee's total tasks and duties by location, such as those performed at a cash register or a teller window, and consider whether it is feasible for an employee to perform each set of location-specific tasks while seated.  Courts should look to the actual tasks performed, or reasonably expected to be performed, not to abstract characterizations, job titles, or descriptions that may or may not reflect the actual work performed.  Tasks performed with more frequency or for a longer

duration would be more germane to the seating inquiry than tasks performed briefly or infrequently." (*Kilby, supra*, 63 Cal.4th at p. 18.) "[C]onsideration of all the actual tasks performed at a particular location would allow the court to consider the relationship between the standing and sitting tasks done there, the frequency and duration of those tasks with respect to each other, and whether sitting, or the frequency of transition between sitting and standing, would unreasonably interfere with other standing tasks or the quality and effectiveness of overall job performance." (*Ibid.*; *id.* at p. 20 [rejecting a "holistic approach" that would require a court to "consider *all* of an employee's tasks regardless of the frequency, duration, and location of those tasks"].)

In assessing feasibility, the employer's business judgment and the physical layout of the workspace may be relevant considerations. (*Kilby, supra*, 63 Cal.4th at pp. 21-22.) However, physical differences among employees are not relevant to the section 14(A) inquiry. "That provision requires a seat when the nature of the *work* reasonably permits it, not when the nature of the *worker* does." (*Kilby, supra*, at p. 23.)

2. *Analysis*

a. *A Drive-thru Cashier's Actual Tasks Require Movements That Cannot Be Performed from a Seated Position*

We begin "with an examination of the relevant tasks, grouped by location, and whether the tasks can be performed while seated or require standing." (*Kilby, supra*, 63 Cal.4th at pp. 19-20.)

31

(i)    <u>Primary Duties</u>

It is undisputed that a drive-thru cashier's primary job duties are to confirm the customer's order, take payment from the customer, and under the proper circumstances, provide change and/or a receipt to the customer.  Luckett has not offered any evidence to dispute that customer service is also part of a drive-thru cashier's primary duties or that customer service includes providing fast service.

(ii)    <u>Secondary Duties</u>

The parties dispute the extent of a drive-thru cashier's secondary duties.  McDonald's offered evidence in the form of Dr. Fernandez's report of ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████.  Luckett attempts to create a factual dispute by reference to ████████████████████████████████████████.  Luckett argues that ████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████.  As *Kilby* made clear, however, in making a determination under section 14(A), "Courts should look to the actual tasks performed, or reasonably expected to be performed, not to abstract characterizations, job titles, or descriptions that may or may not reflect the actual work performed."  (*Kilby*, *supra*, 63 Cal.4th at p. 18.)  ███████████ ███████████████████████████████████████████████ ███████████████

Luckett also attempts to create a factual dispute by observing █████████████████████████████████████ ███████████████████████████████████████████████

32

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████. (See *Kilby,*

*supra,* 63 Cal.4th at p. 18.) ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

### (iii) <u>The Movements Necessary to Perform Drive-thru Cashier Tasks Require Standing</u>

McDonald's adduced evidence that the drive-thru cash booth tasks require standing. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

Luckett seeks to demonstrate a triable issue ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

We again observe that *Kilby* cautions against relying on abstract characterizations or job descriptions in determining the nature of the work.  (*Kilby, supra,* 63 Cal.4th at p. 18.)  Second, even construing ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

33

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████. Indeed, McDonald's presented evidence that the duties of an injured or disabled drive-thru cashier that it has accommodated with a seat are not coextensive with the ordinary, full duty tasks for that position. Sabbagh and Cramer stated that when an accommodated employee is permitted to sit in the booth, McDonald's reduces its expectations for performance, frequency of movement, speed, efficiency, and the performance of secondary duties.

In the trial court, Luckett claimed McDonald's accommodation policies merely identified "existing job positions with physical requirements that align with the crew members physical limitations." However, ████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ uses the language "existing job position" or indicates an "existing job position" means the same thing as an existing job position without any modification, i.e., full duty. On appeal, Luckett abandons this unpersuasive "existing job position" argument, but insists ███████████████ ████████████████████████████████████████████████████ ██████████████████████. He offers no cogent reason why ██ ████████████████████████████████████████████████████, and we reject his claim.

Luckett also points to evidence that drive-thru cashier tasks can be performed seated in the form of his own testimony concerning an accommodated employee he observed, the declarations of three McDonald's employees who were provided a

seat as an accommodation in the drive-thru booth, and the declaration of an employee who chose to sit. Luckett testified the cashier he observed was able to perform all his job duties. Similarly, the four employees declared that despite being seated, they were "able to successfully" complete their drive-thru cashier duties.

This testimony is too broadly phrased, subjective, and conclusory to create a disputed fact regarding all full-time employees. (See *Sinai Memorial Chapel v. Dudler*, *supra*, 231 Cal.App.3d at pp. 196-197.) Moreover, because Luckett has not presented competent evidence to dispute the fact that McDonald's relaxes its expectations for its accommodated workers, Luckett's testimony and the testimony of each of the three accommodated employees is irrelevant to the question of whether seated, full-duty drive-thru cashiers could perform all of their job duties, including meeting the expectations of their employer relating to speed, efficiency, or customer service. Further, neither Luckett nor any of the declarants, including the employee who chose on his own to sit while working in the drive-thru cash booth, are competent to testify that from an ergonomics perspective, the work could be performed from a seated position or to testify as to legal conclusions, as the declarants attempt to do with statements such as "the tasks associated with working as a cashier and/or performing cashiering-related duties at the drive-thru[ ] reasonably permitted the use of a seat." (See Evid. Code, § 800 ["If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] . . . Rationally based on the perception of the witness"].)

35

The statements from the seven employee declarants that "almost all the equipment needed to perform [their jobs] were within reaching distance," and that customers "normally" position their cars close enough to the window so that any reaching was "minimal" are similarly vague and conclusory. These statements fail to contradict McDonald's evidence—including Luckett's own testimony that he had to lean out of the window to hear customers—demonstrating that drive-thru cashiers must engage in *some* reaching and/or leaning out of the window.

Luckett claims "[t]he trial court heavily relied on [McDonald's] expert testimony, and the fact that Luckett lacked a counter expert," and argues he was not required to produce such an expert to create a triable issue.[6] In support of his argument, Luckett relies on *Brown v. Wal-Mart Stores, Inc.* (N.D. Cal., July 13, 2018, No. 09-cv-03339-EJD) 2018 WL 3417483, in which the district court denied cross-motions for summary judgment after finding the parties' evidence (which included lay testimony) created several triable issues, including with respect to whether a suitable seat existed.

Luckett's decision not to submit expert testimony is not the problem; it is that the testimony Luckett did submit was not competent evidence of a triable issue of fact. The facts of *Brown* stand in stark contrast. The plaintiffs in *Brown* submitted evidence that prior to the litigation, Wal-Mart had retained a third-party expert consulting firm to determine the impact of seat

---

[6] To be clear, the trial court's ruling did not refer to Luckett's lack of a rebuttal expert or base its decision on any such ground.

use by cashiers and had successfully identified a suitable stool for cashiers' use that took into account considerations of the essential job functions to be performed by cashiers, the layout of the checkout lane, and possible ergonomic issues resulting from the use of the stool. (*Brown v. Wal-Mart Stores, Inc.*, *supra*, 2018 WL 3417483 at pp. *12, *14.) The plaintiffs also submitted the deposition testimony from two Wal-Mart deponents admitting that the company had determined that cashiers could safely use a stool during the performance of their job duties, that the presence of an approved stool did not create safety hazards for cashiers, and that use of a stool would likely decrease accidents. (*Ibid*.) Here, Luckett does not offer similar evidence but instead vague and conclusory statements, and none from individuals qualified to speak on behalf of McDonald's.

> b. *Feasibility*

We next balance the above task-based assessment against the record evidence pertaining to considerations of feasibility. Feasibility may include considerations of whether providing a seat would unduly interfere with other standing tasks, whether the frequency of transition from sitting to standing may interfere with the work, or whether seated work would impact the quality and effectiveness of overall job performance. This inquiry may include consideration of the physical layout of the booth and the employer's business judgment. (*Kilby*, *supra*, 63 Cal.4th at pp. 19-20.)

> (i) <u>The Physical Layout of the Booth Makes Use of a Seat Therein Unworkable</u>

"[T]he physical layout of a workspace may be relevant in the totality of the circumstances inquiry." (*Kilby*, *supra*, 63 Cal.4th at p. 22.) However, "an employer may not unreasonably

37

design a workspace to further a preference for standing or to deny a seat that might otherwise be reasonably suited for the contemplated tasks." (*Ibid*.) Although " 'facts regarding technical aspects of workplace configurations or studies may be relevant to determining whether suitable seating can be provided, the application of the standard is essentially one of overall reasonableness applied to the particular facts.' " (*Ibid*.) "Evidence that seats are used to perform similar tasks under other, similar workspace conditions may be relevant to the inquiry, and to whether the physical layout may reasonably be changed to accommodate a seat. . . . [R]easonableness must be based on the particular circumstances." (*Ibid*.)

McDonald's offered evidence that ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████. Indeed, Cramer confirmed the drive-thru cash booths were designed for standing work. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

Luckett does not present evidence to dispute that the booths were designed for standing work. Instead, Luckett argues

a seat can fit within the cash booth because accommodated employees have used seats in that space. Whether a seat can fit, however, is not the same as whether it is ergonomically sound to do so. Luckett points out that there are no reports of anyone tripping as a result of a chair placed in the drive-thru booth for any of the accommodated employees. As discussed above, however, the experiences of accommodated employees, for whom McDonald's modified its expectations, are not an appropriate source of data from which to extrapolate what may occur if seats were regularly provided to full duty drive-thru cash booth employees. Indeed, that no one has tripped yet does not contradict █████████████████████████████████████ ████████████████████████████████████████████████ ████████ .

Luckett also does not present competent evidence to dispute Dr. Fernandez's conclusion ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ . Instead, Luckett argues the proper question is whether "adding a seat to the cash booth would aid an employee's health or harm it." In this regard, Luckett points to Dr. Fernandez's ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████
████ .

Luckett also cites the employee declarants' testimony that standing at the cash booth caused them pain and discomfort. But Luckett does not provide evidence that this pain or discomfort rose to the level of a chronic condition or musculoskeletal disorder or that sitting would be the only solution to address that pain or discomfort. In fact, in questioning Dr. Fernandez, Luckett's counsel noted ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████ .

Luckett also seeks to undermine Dr. Fernandez's conclusions that ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████ . (See *General Elec. Co. v. Joiner* (1997) 522 U.S. 136, 146 [118 S.Ct. 512, 139 L.Ed.2d 508] ["Trained experts commonly extrapolate from existing data"]; *In re NJOY, Inc. Consumer Class Action Litigation* (C.D. Cal. 2015) 120 F. Supp.3d 1050, 1071 [ruling that an expert's failure to perform a survey or study "does not automatically render his opinion or methodology unreliable" because experts may instead rely on published

studies addressing analogous issues].) For example, Dr. Fernandez's report ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████.

(ii) <u>Interference with Cashiering Duty of Providing Fast and Efficient Customer Service, and Business Judgment</u>

Generally speaking, "There is no question that an employer may define the duties to be performed by an employee." (*Kilby*, *supra*, 63 Cal.4th at p. 21.) " '[A]n employer's business judgment largely determines the nature of work of the employee both generally, as well as duties or tasks specifically.' " (*Ibid.*) "[S]uch duties are not limited to physical tasks. Providing a certain level of customer service *is* an objective job duty that an employer may reasonably expect. An employee's duty to provide a certain level of customer service should be assessed, along with other relevant tasks and obligations, in determining whether the nature of the work reasonably permits use of a seat at a particular location. Providing customer service is an objective job function comprised of different tasks, e.g., assisting customers with purchases, answering questions, locating inventory, creating a welcoming environment, etc. [¶] However, 'business judgment' in this sense does not encompass an employer's *mere preference* that particular tasks be performed while standing. The standard is an objective one." (*Ibid.*)

Here, McDonald's demonstrated that its original decision to have its drive-thru cashiers stand was not based on mere preference. Rather, Cramer declared considerations for an

41

efficient and ergonomically sound workspace drove the design of the cash booth. Further, McDonald's presented evidence that the introduction of a seat into the drive-thru cash booth would interfere with the cashier's duty of providing fast and efficient customer service, ███████████████████████████ ███████. Specifically, McDonald's presented evidence ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████. Indeed, Luckett acknowledged that when transactions take too long, customers will leave the drive-thru line, and ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████.

McDonald's also established through Dr. Fernandez's report that ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.

Luckett argues he presented sufficient evidence to create a triable issue as to whether providing a seat to a drive-thru cashier affects the level of customer service provided. Specifically, Luckett points to his observation of the accommodated employee and the statements from the declarants who used a seat that they were able to perform their job duties. He further points to statements from the four employee declarants who used a chair that they were never informed of any complaints relating to delays or customer service. However, these statements are merely subjective, anecdotal, and

situational evidence that do not create a genuine dispute of McDonald's evidence, especially considering that for three of these declarants, McDonald's relaxed its performance expectations. Further, the employee declarants' subjective and conclusory statement that the increase in transaction time based upon transitioning from sitting to standing would be "minimal" fails to create a genuine issue of material fact, ███████████ ███████████████████████████████████████████████ ████████.

Luckett also argues that McDonald's PMK, Sabbagh, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████. Luckett does not explain the import of this observation. Nevertheless, it does not create a triable issue. Although Sabbagh, who was deposed on January 14, 2021, testified ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ Luckett's counsel deposed Sabbagh approximately one month before Dr. Fernandez issued his February 12, 2021 report. That report provided a critical link ██████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████.

Accordingly, Luckett has not demonstrated a genuine issue of material fact as to whether it is feasible to place a seat in the drive-thru cash booths. A totality of the circumstances inquiry often requires the weighing of several facts and factors.

However, because none of the relevant factors here support a ruling in favor of Luckett, the party opposing summary judgment, we conclude that summary judgment was proper.

**D.    There Is No Triable Issue of Fact Regarding a Suitable Seat**

"An employer seeking to be excused from the [suitable seating] requirement bears the burden of showing compliance is infeasible because no suitable seating exists." (*Kilby*, *supra*, 63 Cal.4th at p. 24.)  "Suitable seating must mean safe seating." (*Garvey v. Kmart Corp.* (N.D. Cal., Dec. 18, 2012, No. C 11-02575 WHA) 2012 WL 6599534 at p. *9.)

McDonald's argues that no suitable seat exists.  Dr. Fernandez ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████

Luckett again points to McDonald's accommodation policy and practices, and the employee declarations expressing their beliefs that various types of seats could fit inside the cash booth and that all job functions could be performed seated. This evidence does not create a genuine dispute as to whether a suitable seat exists. The use of a chair on a temporary basis as an accommodation does not mean it is a "suitable seat" to be used without an accommodation when the employee is performing their unmodified job duties. The fact that a seat can be used as an accommodation if changes are made to the employee's job duties and performance expectations is irrelevant to the question whether there is a suitable seat that is safe for employees during the regular course of business. As for the declarations, subjective and conclusory expressions of belief that a generic chair could be used in the cash booth do not rebut Dr. Fernandez's expert analysis ███████████████████████████████████.

Luckett also challenges Dr. Fernandez's ██████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████.

Thus, we conclude Luckett did not raise a genuine issue of material fact as to whether suitable seating exists.

45

## DISPOSITION

The judgment is affirmed.  McDonald's is awarded its costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

46