Filed 3/25/25  Rose v. Hobby Lobby Stores CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KELLY ROSE,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>HOBBY LOBBY STORES, INC.,<br><br>　　　　Defendant and Respondent. | A168301<br><br>(Alameda County<br>Super. Ct. No. RG17862127) |

Kelly Rose, who had been employed by Hobby Lobby Stores, Inc. (Hobby Lobby) as a cashier in a Hobby Lobby retail store, sued her former employer under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq. (PAGA)) alleging violations of the so-called "suitable seating" provisions in Industrial Welfare Commission Wage Order No. 7-2001, which applies to employees "in the mercantile industry."[1]  (Cal. Code Regs. tit. 8, § 11070, subds. 1, 14.)  After a bench trial, the court found for Hobby Lobby, for reasons set forth in a detailed statement of decision, and

---

[1] Industrial Welfare Commission Wage Orders, which address employee wages, hours, and working conditions, are industry-specific. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1018, fn. 1; see generally Cal. Code Regs., tit. 8, §§ 11010-11170.)  Section 1198 of the Labor Code provides that it is unlawful to employ an employee under conditions prohibited by a wage order.

1

Rose now appeals from the judgment that followed. She fails to show error, and therefore we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Hobby Lobby operates retail stores selling arts and crafts supplies, party supplies, and home goods. Rose was employed by Hobby Lobby as a cashier at its store in Hanford, California, from June 2015 to September 2016.

The workspaces for cashiers at Hobby Lobby stores, called "cashwraps" or "cash wraps," do not provide seating for cashiers.[2] Hobby Lobby manufactures its own cashwraps, which have a uniform design and configuration in all Hobby Lobby retail stores throughout the country. Each cashwrap consists of three modules in a U-shaped arrangement: a register stand, a checkout counter, and a privacy panel. As of the time of trial, Hobby Lobby had used the same cashwrap design for at least 25 years; the design long predated Hobby Lobby's 2011 entry into California. The area within a cashwrap where a cashier stands measures 24.5 inches in width and 54 inches in length. There are about 10 cashwraps in each Hobby Lobby store in California.

A.    *Requirements for Suitable Seating*

California law requires employers to provide suitable seating for employees working in the mercantile industry under certain circumstances. Under the law, "[a]ll working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats" (Cal. Code Regs. tit. 8, § 11070, subd. 14(A) (section 14(A)); in addition, "[w]hen

---

[2] In the record before us, the term for Hobby Lobby checkout stands is spelled sometimes as "cashwrap" and sometimes as "cash wrap." We adopt appellant's convention of using the one-word spelling for consistency.

employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties."  (*Id.*, subd. 14(B) (section 14(B).)

The controlling authority on the application of sections 14(A) and 14(B) is *Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1 (*Kilby*).  In *Kilby* our Supreme Court held as follows:  The phrase "nature of the work," which appears in sections 14(A) and 14(B) "refers to an employee's tasks performed at a given location . . . . If the tasks being performed at a given location reasonably permit sitting, and provision of a seat would not interfere with the performance of any other tasks that may require standing, a seat is called for. [¶] . . . Whether the nature of the work reasonably permits sitting is a question to be determined *objectively* based on the *totality of the circumstances*.  An employer's business judgment and the physical layout of the workplace are relevant but not dispositive factors."  (*Id.* at p. 8, italics added.)

The Supreme Court explained that "the 'nature of the work' under section 14(A) [includes] an employee's actual or expected tasks.  If tasks are performed at a discrete location, those tasks should be considered together in evaluating whether work there reasonably permits the use of a seat."  (*Kilby*, *supra*, 63 Cal.4th at  p. 19.)  Focusing on the work done at a particular location allows courts "to consider the relationship between the standing and sitting tasks done there, the frequency and duration of those tasks with respect to each other, and whether sitting, or the frequency of transition between sitting and standing, would unreasonably interfere with other standing tasks or the quality and effectiveness of overall job performance."

3

(*Id*. at p. 18.) "Tasks performed with more frequency or for a longer duration would be more germane to the seating inquiry than tasks performed briefly or infrequently." (*Ibid.*)

The Supreme Court also explained how business judgment and the physical layout of a workplace are to be considered in the assessment of relevant factors. As for business judgment, the court explained that "[a]n employer's evaluation of the quality and effectiveness of overall job performance" is an aspect of business judgment that may "be objectively considered in light of the overall aims of the regulatory scheme, which has always been employee protection." (*Kilby*, *supra,* 63 Cal.4th at p. 21.) Accordingly, consideration of the totality of the circumstances "properly takes into account an employer's reasonable expectations regarding customer service and acknowledges an employer's role in setting job duties [and] takes into account any evidence submitted by the parties bearing on an employer's view that an objective job duty is best accomplished standing." (*Id.* at pp. 21-22.) But considerations of business judgment do not extend to "an employer's *mere preference* that particular tasks be performed while standing." (*Id* at p. 21.)

As for the physical layout of the workplace, the court observed that to the extent the physical layout of a workspace informs employer and employee expectations of job duties, the physical layout of a workspace "should be accounted for in the totality of the circumstances inquiry." (*Kilby*, *supra*, 63 Cal.4th at p. 22.) The court explained that "reasonableness must be based on the particular circumstances," and that "[e]vidence that seats are used to perform similar tasks under other, similar workspace conditions" and evidence as to "whether the physical layout may reasonably be changed to accommodate a seat" may be relevant in considering whether the nature of

4

the work reasonably permits the use of a seat. (*Ibid.*) "[J]ust as an employer's mere preference for standing cannot constitute a relevant 'business judgment' requiring deference, an employer may not unreasonably design a workplace to further a preference for standing or to deny a seat that might otherwise be reasonably suited for contemplated tasks." (*Ibid.*)

*Kilby* instructs that "if the nature of the work reasonably permits seated work . . . [a]n employer seeking to be excused from the requirement [of providing a suitable seat] bears the burden of showing compliance is infeasible because no suitable seating exists." (*Kilby*, *supra*, 63 Cal.4th at p. 24.)

Another point addressed in *Kilby* is the interaction of sections 14(A) and 14(B). *Kilby* explains that the protections provided to employees under sections 14(A) and 14(B) are not mutually exclusive: they "may apply at various times during the workday though not at the *same* time." (*Kilby*, *supra*, 63 Cal.4th at pp. 18-19.) Employees working at locations where they must perform standing tasks are "entitled to a seat under 14(B) during 'lulls in operation,' " which occur "when an employee, while still on the job, is not then actively engaged in *any* duties." (*Id.* at p. 19.) A seat satisfies the requirement of section 14(B) if "it is within 'reasonable proximity to the work area' (§ 14(B)) and is available when work is not required to be performed." (*Ibid.*)

B.    *PAGA Notice*

In March 2017, Rose notified the Labor and Workforce Development Agency and Hobby Lobby that she intended to seek civil penalties and other relief on behalf of herself and other hourly-paid individuals who were employed by Hobby Lobby as cashiers or who were assigned cashier duties,

5

based on alleged violations of sections 14(A) and 14(B). (See Lab. Code, § 2699.3, subd. (a)(1)(A) [describing the PAGA notice requirement].)

With respect to section 14(A), Rose alleged that her job duties as a cashier included operating the cash register, bagging items, handling returns, and providing customer service; that most of the job duties of cashiers "were performed from and connected to a cash register or cashwrap"; that the nature of the work of an employee performing cashier duties, including operating the cash register, bagging items, and providing customer service, can reasonably be accomplished from a sitting position; and that Hobby Lobby did not provide seats or stools for cashiers at cashwraps and counters even though "there is ample space behind each cashwrap and counter to allow for the presence and use of a seat or stool."

With respect to section 14(B), Rose alleged that, to the extent cashiers engaged in duties where the nature of the work required standing, Hobby Lobby did not provide cashiers with seats or stools in reasonable proximity to the cashwraps for them to use at times when they were not actively engaged in the duties that required standing, even though the layout of the areas adjacent to the cashwraps could accommodate seats or stools.

C.    *Complaint and First Amended Complaint*

In May 2017, after the time for the Labor and Workforce Development Agency to respond to Rose's notice had passed (Lab. Code, § 2699.3, subd. (a)), Rose filed a civil action against Hobby Lobby alleging two causes of action—one for violation of section 14(A) and one for violation of section 14(B)—based on the facts and theories alleged in her PAGA notice. (See *id.*, subd. (a)(1)(A) [PAGA notice must identify "the specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation"].)

6

The operative First Amended Complaint, filed in May 2020, likewise alleged causes of action for violation of sections 14(A) and 14(B), but with amendments that Rose characterizes as reflecting information she obtained in discovery and through consultation with an ergonomic expert in the course of litigation. Instead of alleging that there was "ample space behind each cashwrap" for a seat or stool that a cashier could use while performing his or her duties, Rose alleged in her First Amended Complaint that there would be ample space "*with reasonable and minor modifications* to the checkstand area." (Italics added.) Similarly, with respect to the cause of action for violation of section 14(B), instead of alleging only that the layout of Hobby Lobby workplaces could accommodate seats or stools for cashiers to use when they were not engaged in duties that required standing, Rose added an allegation that "placing seats or stools in the cashwrap work areas *would have required only reasonably modest modifications to these work areas*, if any." (Italics added.)

D. *Trial, Statement of Decision, and Judgment*

Rose's case was tried over nine days before the Honorable Evelio Grillo. The court issued a 29-page statement of decision that included a summary and analysis of the applicable law as well as detailed discussion and evaluation of the evidence. The court found for Hobby Lobby on both causes of action for reasons set forth in the statement of decision.

No party submitted any objection to the statement of decision. Judgment was entered for Hobby Lobby, and Rose timely appealed.

## DISCUSSION

A. *Standard of Review*

It is a fundamental principle of appellate review that "[a] judgment or order of a lower court is presumed to be correct on appeal, and all

7

intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) In reviewing a judgment based upon a statement of decision issued after a bench trial, we apply well-established standards of review. (*Gajanan, Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791 (*Gajanan*).) "We review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard. [Citation.] We construe findings of fact liberally to support the judgment; consider the evidence in the light most favorable to the judgment; draw all reasonable inferences in support of the findings; and infer that the trial court ' "impliedly made every factual finding necessary to support its decision." ' " (*Id.* at pp. 791-792.)

B.  *Section 14(A)*

   1.  *Additional Background*

As reflected in her First Amended Complaint, Rose's first cause of action, for violation of section 14(A), rested on allegations that "a substantial amount of [the tasks performed by cashiers] could have been performed from a seated position at their cashwraps," and that placing seats or stools at the cashwraps "would have required only reasonably modest, if any, modification to these work areas."

That is the theory on which she tried her case, as we see in the trial court's statement of decision. The trial court not only summarized the witness testimony (including testimony from plaintiffs' percipient witnesses, who had worked as Hobby Lobby cashiers, and the parties' ergonomics experts), but also described its observations of demonstrations conducted in the courtroom, where each party had installed a cashwrap to show how the functionality of a cashier working in a cashwrap would, or would not, be

8

impaired by the use of a "perching stool," which supports the body in a position between standing and sitting.

As the trial court explained, plaintiff's ergonomics expert, Dr. Clarissa Harris, opined that use of a perching stool would ameliorate adverse health outcomes associated with prolonged standing; that a perching stool would be a suitable seat for Hobby Lobby cashiers; and that a "Muvman" perching stool, which was adjustable, allowed forward leaning, and swiveled, would be particularly appropriate seating for Hobby Lobby cashiers. Dr. Harris opined that physical modification of the cashwrap and reorganizing items within the cashwrap would be required to allow for both sitting on a perching stool and standing within a cashwrap. The modifications would include cutting back and removing shelves and cutting back the privacy panel. For purposes of demonstration, Hobby Lobby brought an actual Hobby Lobby cashwrap to court and plaintiff brought a modified cashwrap constructed by plaintiff's expert, and the court observed demonstrations of witnesses working in the cashwraps using a Muvman perching stool. Based in part on those observations, the court found that the Muvman perching stool interferes with cashiers' duties and presents safety hazards to the public and employees because it "tips easily" and "tends to migrate outside of the cashwrap corral."

The court also discussed the evidence presented by Hobby Lobby's ergonomics expert, Dr. Jeffrey Fernandez, who opined that none of the available seating options he reviewed, which numbered close to 1600, would fit in the cashier workspaces and allow cashiers to function safely and effectively, and also opined that sitting while working as a cashier in a confined space like the Hobby Lobby cashwrap increased the risk of musculoskeletal disorders. Dr. Fernandez also addressed adverse health effects and the danger of musculoskeletal injury caused by perching and the

9

use of perching stools, and critiqued Dr. Harris's ergonomic analysis, which, he opined, did not adequately consider the extent to which employees could reach while perching and did not document or consider "back twist."

The court found that Rose had not established her section 14(A) claim, and summarized its conclusion as follows: "The court finds that the work of a Hobby Lobby cashier does not reasonably permit sitting and th[at] providing seating in a Hobby Lobby cashwrap would interfere with other duties of the employees. The court finds that cashiering while seated in the confined space of a Hobby Lobby cashwrap does not allow employees to perform all of the tasks required of a cashier, without requiring the employee to move from a sitting to standing position to complete cashiering tasks, such as opening a cash drawer completely. The court further finds that defendant has proven by a preponderance of the evidence that there is not a suitable seat for use in a Hobby Lobby cashwrap based on, among other things, the potential for increased [musculoskeletal disorder] injuries to employees, and the potential safety hazards to the public and to employees created by placing a seat or chair in the confined space of the cashwrap, less than 25 inches in width. The court finds that the physical layout of the Hobby Lobby cashwrap, as designed or as proposed [to be] modified, does not reasonably allow the placement of a seat within the confines of a cashwrap."

2.     *Analysis*

On appeal, Rose has changed her theory of the case. She does not challenge the trial court's conclusion that Hobby Lobby cashwraps do not allow the placement of a seat, even with Rose's proposed modification; instead, she claims that Hobby Lobby violated California law by designing its cashwraps in California to permit only standing, and that the trial court failed to consider this theory. She argues that we should reverse the trial

10

court's judgment for Hobby Lobby on her section 14(A) cause of action because as a matter of law she proved that Hobby Lobby violated section 14(A) by unreasonably designing its cashwraps in California so as to permit only standing. (*Kilby*, *supra*, 63 Cal.4th at p. 22.) Rose explains that the "error [that] lies at the heart" of her appeal with respect to her section 14(A) claim is the trial court's failure to "evaluate [Rose's] core claim," which she characterizes as whether Hobby Lobby's original design for the cashwrap was unreasonable. In other words, her appeal rests on the argument that the trial court erred by not finding that Hobby Lobby unreasonably designed its cashwraps for standing—a finding that would support a conclusion that Hobby Lobby violated section 14(A).

This argument has been forfeited. Under the doctrine of implied findings, a party waives a claim that a trial court erred by failing to resolve a principal controverted issue in its statement of decision unless the party timely calls the purported deficiency to the trial court's attention. (*Arceneaux*, *supra*, 51 Cal.3d at p. 1132.) Rose argues on appeal that the trial court was required to make a finding as to whether Hobby Lobby unreasonably designed the cashwraps, but she did not object to the trial court's statement of decision, which omitted findings on that issue. Therefore she cannot now complain that the trial court erred by failing to address the question whether the cashwraps were unreasonably designed.

In addition to arguing that the trial court erred by not finding that the cashwraps were unreasonably designed, Rose argues on appeal that there is undisputed evidence in the record that we should evaluate independently to conclude that the cashwraps were unreasonably designed. In reviewing a judgment based on a statement of decision, however, we do not make findings based on purportedly undisputed evidence. Instead, we determine whether a

11

trial court's findings, whether express or implied, are supported by substantial evidence, which may be either contradicted or uncontradicted. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) We do not consider whether evidence might support a finding not made by the trial court. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581-582 (*Schmidt*).)

In any event, Rose's arguments that the cashwrap was unreasonably designed have been forfeited because Rose did not pursue unreasonable design as a theory of liability at trial. (See *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1326 [" ' "[a]s a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were [decided]" ' "].)

Rose strains to assert that she raised unreasonable design theory below, but she can point to nothing in her PAGA notice or in either of her complaints that alleges unreasonable design of the cashwraps. So instead she tries to recast the position she took below by contending that her theory that the cashwrap could be modified to include a seat, as alleged in her First Amended Complaint and argued at trial, "is *premised* on the faulty design of the cashwrap." (Italics added.) The record does not bear out this claim. There is nothing in the record showing that faulty or unreasonable design was the premise of her theory, or that Rose ever alleged or argued that the design was "faulty."

Rose contends that she raised the unreasonable design issue in her pretrial brief, her opening statement, and her closing argument. She did not. She points to her pretrial brief where she quoted the statement in *Kilby* that "an employer may not unreasonably design a workspace to further a

12

preference for standing or to deny a seat that might otherwise be reasonably suited for the contemplated tasks" (*Kilby*, *supra*, 63 Cal.4th at p. 22) and stated that the evidence would show that Hobby Lobby "designed their cashwraps for standing." She also points to her opening statement and closing argument where she asserted that *Kilby* prohibits an employer from designing a workspace for standing and that Hobby Lobby had done just that. But *Kilby* does not prohibit an employer from designing a workspace for standing; instead, it prohibits an employer from "*unreasonably* design[ing] a workspace to further a preference for standing or to deny a seat that might otherwise be reasonably suited for the contemplated tasks." (*Kilby*, *supra*, 63 Cal.4th at p. 22, italics added.) There is no dispute that the cashwraps were designed for standing, as reflected in Hobby Lobby's statement in its posttrial brief that the cashwraps were designed for "standing work." But a showing that the cashwraps were designed for standing is not the same as a showing that the cashwraps were unreasonably designed for standing.[3]

When we leave aside Rose's forfeited arguments concerning the allegedly unreasonable design of the cashwraps, little is left of the arguments in Rose's opening brief that concern her section 14(A) claim, and the little that remains is lacking in merit. Rose's first argument is that in determining whether the nature of cashiers' work permitted seating, the trial court erred by making findings as to whether the cashiers' work could be performed while sitting in an unmodified or modified cashwrap, rather than by making findings as to "whether the nature of the work itself could be performed

---

[3] Although Rose now characterizes unreasonable design as her "core claim," her characterization is belied by her failure to argue the issue in her posttrial brief. Instead, she argued that the work of Hobby Lobby cashiers could be performed effectively by workers who were seated at modified cashwraps.

seated," which is, Rose claims, what *Kilby* requires. But Rose's arguments at trial about whether the nature of the work permitted sitting were based on Dr. Harris's studies of work performed in cashwraps and the in-court demonstrations, which were conducted in unmodified and modified cashwraps; her arguments were not based on abstract analyses of the tasks that cashiers performed. And nothing in *Kilby* suggests that a court's determination whether "the nature of the work reasonably permits the use of seats" (§ 14(A)) must be conducted independent of the actual physical layout of a workplace. To the contrary, *Kilby* recognizes that to the extent the physical layout of workspace informs expectations about job duties, the physical workspace is relevant to the totality of the circumstances inquiry that the court must undertake. (*Kilby, supra,* 63 Cal.4th at p. 22.) Rose has not shown any error by the trial court in this respect.

Rose's second argument is that the trial court was required by *Kilby* to consider whether Hobby Lobby "designed the cashwrap . . . with an unreasonable preference for seating." Nothing in *Kilby* requires a trial court to undertake such an analysis. Certainly a court may do so in connection with its consideration of the physical layout of a workspace, if the issue is raised by the plaintiff; here, however, Rose did not raise the issue, as the trial court explicitly recognized in its statement of decision.[4] As we stated above, if Rose believed the trial court's statement of decision omitted findings on a

---

[4] In its statement of decision the trial court wrote that Rose "did not raise the design of the cashwrap itself as the basis for the seating claim in the notice of claim, nor did [she] present evidence or pursue a theory at trial that the configuration of the cashwrap constituted a separate seating violation. Plaintiff argued that the existing cashwraps could be modified to accommodate a perching stool, but nowhere did [she] argue that the configuration of the cashwrap, *ipso facto*, constituted a violation of [section] 14(A)."

14

principal controverted issue, she was required to object to the trial court's statement of decision. She did not.

Rose's third argument is that the trial court erred by "focusing on plaintiff's proposed modification" of the cashwraps and "ignoring" what she characterizes as "undisputed evidence" that seats had been used by some Hobby Lobby cashiers in the past, that cashiers at a grocery store in Hanford had performed duties while seated, and that Wal-Mart had conducted a study in which cashiers were allowed to sit at registers. (Capitalization omitted.) Any purported error made by the trial court in "focusing" on plaintiff's proposed modification was invited by plaintiff, whose case was premised on her allegation that placing seats at cashwraps "required only reasonably modest, if any, modifications to these work areas," and who, as the trial court wrote in its statement of decision "argue[d] extensively and presented evidence at trial to establish that it was feasible to make modifications to the cashwraps to allow the work of cashiers to be performed while seated or perched." (See *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000 [" 'when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error' "].) As to her claim that the trial court improperly "ignored" or "disregarded" undisputed evidence, Rose cites no authority that a statement of decision must catalog every piece of purportedly undisputed evidence that was presented in a trial, and we are aware of none. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["[w]hen legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration"].)

Rose's final argument concerning section 14(A) is that the trial court erred in finding that Hobby Lobby had established that a suitable seat did

15

not exist for Hobby Lobby cashiers.  We need not reach this argument.  *Kilby* explains that "*if* the nature of the work reasonably permits seated work, section 14(A) unambiguously states employees 'shall be provided with suitable seats.' . . . An employer seeking to be excused from the requirement bears the burden of showing compliance is infeasible because no suitable seating exists." (*Kilby*, *supra*, 63 Cal.4th at p. 24, italics added.)  The parties agree that an employer's claim that no suitable seating exists is an affirmative defense to a section 14(A) claim.  Because the trial court found that the nature of the work of a Hobby Lobby cashier does not reasonably permit sitting, there is no need to consider whether Hobby Lobby is excused from providing seating.

C.     *Section 14(B)*

Rose's second cause of action alleged violations of section 14(B), which requires employers to provide seats in reasonable proximity to work areas for employees to use when: (a) the nature of the work at a location requires standing; (b) there are " 'lulls in operation' " at that location, during which an employee, while still on the job, is not actively engaged in any duties; and (c) use of the seat does not interfere with the performance of an employee's duties. (*Kilby*, *supra*, 63 Cal.4th at p. 19.)

1.     *Additional Background*

In analyzing Rose's section 14(B) claim, the trial court distinguished between main cashiers, who were assigned to a cashwrap at the front of the store for their entire shift, remaining there even when customers were not present, and back-up or floater cashiers, who staffed cashwraps farther away from the front entrance on an "as needed" basis and who returned to other departments when instructed.  The court found for Hobby Lobby on Rose's section 14(B) cause of action as to both main and back-up cashiers.

16

The trial court found that the nature of the work, for main cashiers at cashwraps and for back-up cashiers at cashwraps and other locations, did not reasonably permit the use of seats, and that Rose had not shown that cashiers experienced lulls in operation for the purposes of section 14(B).

Based on the testimony of plaintiffs' percipient witnesses, the court found that although cashiers at times experienced "lulls" during which they were not actively checking out customers at a cashwrap, cashiers had other duties they were required to perform besides checking out customers, "such as greeting customers, loss prevention and security, *i.e.* observing who was entering and leaving the store, returning 'go backs,['] as well as 'zoning'—the moving of products . . . so customers could see and purchase the product—as well as dusting and cleaning and arranging merchandise and going out into the store or being assigned to other departments." The court concluded that this testimony, which established that "all cashiers, both the main and the backup cashiers[,] had other duties they were required to perform when not actively 'cashiering' or checking out a customer," called into question "the very concept of a 'lull' in the job of a cashier—particularly back-up cashiers."

The court found that although there was some evidence in the record from the testimony of Rose's expert Dr. Harris that some cashiers experienced lulls in their work that would allow them to sit, the evidence was of limited persuasive force because Dr. Harris based her testimony on a very limited set of observations and because Dr. Harris's task analysis failed to recognize that cashiers who were not checking out customers were not merely "waiting" for customers or experiencing lulls for the purposes of section 14(B) but were performing other tasks, including "looking around the store and observing people, walking around and adjusting the candy rack, and cleaning." Ultimately the court found that "lulls" in checking out customers,

17

for both main and back-up cashiers, do not constitute lulls in cashiers' duties for purposes of section 14(B), and found specifically that in addition to checking out customers and performing duties such as dusting and cleaning at the cashwraps, back-up cashiers had other duties, such as stocking shelves and returning go-backs to a central location, that could not be accomplished while sitting, or that required their absence from the cashwraps.

In addition, the court found that there was not a suitable seat that could be placed in or near a cashwrap for cashiers to use that would not interfere with the performance of standing tasks. The court had already found, in connection with its analysis of Rose's section 14(A) claim, that placing a seat within a cashwrap raised safety and ergonomic concerns, including issues arising from the need to move or store the seat to make room to stand for standing tasks. The court further found that placing a chair or stool in immediate proximity to a cashwrap would create safety hazards, and that placing a chair or stool away from the cashwrap areas, in areas not traversed by the public, would interfere with standing tasks, for both main and back-up cashiers.

2. *Analysis*

On appeal, Rose contends that the trial court found that Hobby Lobby main cashiers experience lulls in standing duties that entitle them to suitable seats—a finding that appears nowhere in the trial court's statement of decision. Rose acknowledges that the trial court found that back-up cashiers did not experience lulls, but contends that back-up cashiers are nevertheless entitled to suitable seats; therefore, Rose suggests that the trial court erred in finding that back-up cashiers do not experience lulls under section 14(B). Rose states that all cashiers experience periods when they were "stuck at the register with nothing to do"; that they were entitled to suitable seating

18

during those periods under section 14(B); and that the trial court did not conduct a proper analysis as to whether suitable seats could be placed in reasonable proximity to their work areas for use during lulls when it did not interfere with the performance of their duties.

We begin by considering the trial court's application of section 14(B) to main cashiers. Rose does not point to anything in the trial court's statement of decision that constitutes a finding that main cashiers experience lulls in standing duties: instead, she argues that by finding that back-up cashiers *did not* experience lulls the trial court "implicitly found" that main cashiers *did* experience lulls. This misreads the statement of decision, which we summarized above, and misapplies the principles by which we review judgments based on statements of decision. (See *Gajanan*, *supra*, 77 Cal.App.5th at p. 792 [appellate courts construe findings of fact in statements of decision "liberally to support the judgment"].) Based on the testimony of Rose's percipient witnesses the court found that *all* cashiers had duties to perform when not actively checking out customers, and the witness testimony had not proved that there were any lulls in their work. The court emphasized that lulls in checking out customers were not lulls in work, because all cashiers had duties they were required to perform when not actively checking out customers. The court further found that Dr. Harris's testimony did not show that there were lulls in cashiers' duties. Thus, the trial court concluded that Rose had not proved there were " 'lulls in operation' when an employee, while still on the job, is not then actively engaged in *any* duties," during which an employee would be entitled to a seat under section 14(B). (*Kilby*, *supra*, 63 Cal.4th at p. 19.)

As we stated above, Rose acknowledges the court found that back-up cashiers do not experience lulls, but she appears to argue that the court erred

in making that finding.  To show error, however, Rose would have to demonstrate that the trial court's finding was not supported by substantial evidence, which she does not purport to do.  (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [substantial evidence challenge requires appellant "to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*"].)  Rather than setting forth, discussing, and analyzing all the evidence on the issue—including evidence as to cashiers' duties at a cashwrap other than checking out customers—Rose argues only that there was evidence that there were times when back-up cashiers were required to remain at cashwraps at the front of the store in the absence of customers to check out, while waiting for a customer service manager to release them to go back to their other duties.  The question before us, however, is not whether there might be evidence in the record to support a finding different from the trial court's:  we consider only whether there is substantial evidence, whether contradicted or uncontradicted, to support the findings that were made.  (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581-582.)

Rose has not shown that the trial court erred in finding that Hobby Lobby cashiers do not experience lulls in operation for the purposes of section 14(B), and therefore we need not reach her argument that the trial court erred in finding that suitable seats could not be placed in reasonable proximity to Hobby Lobby cashwraps for cashiers to use during lulls.

## DISPOSTION

The judgment is affirmed.  Hobby Lobby shall recover its costs on appeal.

20

_____

Miller, J.

WE CONCUR:


_____

Richman, Acting P.J.


_____

Desautels, J.


A168301, *Rose v. Hobby Lobby Stores, Inc.*